UNITED STATES of America ex rel., Edward T. AUGUSTINE, Plaintiffs,

v.

CENTURY HEALTH SERVICES, INC. et. al., Defendants.

Alexis M. Herman, Plaintiff,

v.

George D. Gilley, et. al., Defendants.

Nos. 3–96–1048, 3:97–0504.

United States District Court, M.D. Tennessee, Nashville Division.

Nov. 30, 2000.

Rachel L. Waterhouse, Office of the United States Attorney, Nashville, TN, Thomas Neal Bateman, Robert Thomas Bateman, Bateman, Bateman & Darnell, Clarksville, TN, Stanley E. Keen, Office of the Solicitor, U.S. Department of Labor, Atlanta, GA, and Michael Taxay, Department of Justice, Washington, DC, for USA, ex rel.

Thomas Neal Bateman, Robert Thomas Bateman, Bateman, Bateman & Darnell, Clarksville, TN, for Edward T. Augustine.

John S. Colley, III, Colley & Colley, Columbia, TN, William P. Suriano, Riverside, IL, for Century Health Services, Inc., Century Home Health Care of Smithville, Inc., Century Home Health Care of Jackson, Inc., Century Home Health Care of Dickson, Inc., Century Home Health Care

of Northeast Tennessee, Inc., Century Home Health Care of South Tennessee, Inc., Century Home Health Care of West Tennessee, Inc., Century Home Health Care of Nashville, Inc., Century Home Health Care of Lake Charles, Inc., Century Home Health Care of Memphis, Inc., Century Home Health Care of Illiana, Inc., Bill D. Goforth, George D. Gilley.

### MEMORANDUM

HAYNES, District Judge.

This consolidated action is comprised of two enforcement actions by the United States and the Secretary of Labor under different federal statutes against several common defendants. This Court granted the Secretary's motion for summary judgment (Docket Entry No. 97) in *Alexis M. Herman v. George D. Gilley, et. al.*, No. 3:97–0504, and on August 28, 2000, entered final judgment in that action.

In *United States ex rel. Edward T. Augustine v. Century Health Services, Inc. et al.*, No. 3:96–1048, the United States, acting through its Department of Justice, on behalf of the Department of Health and Human Services (HHS), joined Edward T. Augustine, the relator, to file a complaint under the False Claims Act, 31 U.S.C. §§ 3729 through 3733, coupled with common law theories of unjust enrichment and payment by mistake against the defendants: Century Health Services Inc. (Century); Century Home Health Care of Smithville, Inc., Century Home Health Care of Jackson, Inc., Century Home Health Care of Dickson, Inc., Century Home Health Care of Northeast Tennessee, Inc., Century Home Health Care of South Tennessee, Inc., Century Home Health Care of West Tennessee, Inc., Century Home Health Care of Nashville, Inc., Century Home Health Care of Lake

Charles, Inc., Century Home Health Care of Memphis, Inc., Century Home Health Care of Illiana, Inc., Bill D. Goforth, and George D. Gilley.

The United States' complaint alleges in sum, that by taking Medicare funds intended for the Plan for their Company's use, the defendants misrepresented the status of the Plans and also concealed their obligations to repay these Medicare funds into Century's ESOP after defendants Gilley and Goforth arranged a loan of Century stock to the Plan.

Specifically, Count I of the amended complaint alleges that the defendants knowingly presented or caused to be presented to the Fiscal Intermediary (FI)[1] for fiscal years 1993 and 1994 cost reports and cost statements that sought payment by Medicare Part A for unallowable, false, or fraudulent ESOP contribution costs, in violation of 31 U.S.C. § 3729(a)(1).

Count II alleges that the defendants knowingly made, used, or caused to be made or used for fiscal years 1993 and 1994 cost reports and cost statements that sought payment by Medicare Part A for unallowable, false, or fraudulent ESOP contribution costs, in violation of 31 U.S.C. § 3729(a)(2).

Count III alleges that the defendants conspired to include unallowable, false, or fraudulent ESOP contribution costs on cost reports and cost statements submitted by Century Health Services (CHS) and CHS Agencies for fiscal years 1993 and 1994, in violation of 31 U.S.C. § 3729(a)(3). Count III further alleges that pursuant to this conspiracy, the defendants submitted or caused to be submitted false claims, and made or caused to be made false statements, for payment by Medicare Part A

---

**1.** The Government's complaint refers to the FI as a the Regional Home Health Intermedi-      ary.

for fiscal years 1993 and 1994, in violation of 31 U.S.C. § 3729(a)(3).

Count IV alleges that in submitting false or fraudulent cost reports and cost statements to the FI for fiscal years 1993 and 1994, and in making false representations to the FI auditor, the defendants knowingly concealed or caused to be concealed information that would have caused HCFA to disallow the $2,760,000 in ESOP contribution costs and to make retroactive adjustments to the cost reports to recover the Medicare ESOP payments, in violation of 31 U.S.C. § 3729(a)(7).

Count V asserts a claim for common law unjust enrichment against the defendants, and Count VI asserts a common law claim of payment by mistake against the defendants.

Under Counts I–IV, the United States and Augustine seek treble damages and penalties for injuries to the Medicare Trust Fund due to defendants' misrepresentations for and misuse of $2.76 million that was disbursed by Medicare to fund the Century's Employee Stock Ownership Plan ("ESOP" or "the Plan"). Under Counts V–VI, the United States seeks repayment of the $2,600,000 that Medicare paid to Century to fund the ESOP.

A bench trial was held on September 20–21 and September 25, 2000. Set forth below are the Court's Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

## A. FINDINGS OF FACT

### The Century ESOP

From 1993 through 1996, Century served as an umbrella organization for ten home health agencies for which Century was the central organizational entity ("home office"). Century was formed when defendant Gilley purchased the assets of several home health companies organized under the name G & G Health Services for $30,000. Gilley obtained the assets of G & G for such a low purchase price because the company was saddled with debt. As a condition of the sale, Medicare regulators required Century to assume G & G's tax liabilities and debts to federal health programs as a result of overpayments to G & G. Gilley incorporated Century and its subsidiaries sometime in 1993.

Gilley initially owned 100% of Century's stock, but later offered defendant Goforth 50% of Century's stock, if Goforth would become Century's President and take charge of operating the company. Goforth accepted Gilley's offer because he thought that Century could become extremely profitable if Congress adopted legislation allowing home health agencies to be reimbursed on a "prospective pay" basis as discussed below. Thus, Gilley and Goforth became Century's sole shareholders with each owning 50% of the company's stock. Gilley served as Chairman of Century's Board of Directors, and Goforth as board member and Century's President.

As Chairman, Gilley, a lawyer, played a very active role in management of the company, among other things, taking the lead on legal issues and closely monitoring the Medicare reimbursement process. As Century's President, Goforth was in charge of company operations, and the Medicare reimbursement process was under his direct supervision. Together, Gilley and Goforth owned, controlled, and ran Century.[2] From the start, Century pro-

---

**2.** Gilley and Goforth had previously worked together in the hotel development business. Together they owned, with others, a business called Equity Development Corporation. The purpose of that business was to buy run down hotels, renovate them, and then sell the hotels for a profit. In the early 1990s, Equity Development Corporation collapsed financially.

vided home health services through its subsidiaries.

The vast majority of Century's revenues, 80–90%, was derived from the federal Medicare program. Medicare reimburses home health agencies on a "reasonable cost basis"; that is Medicare will provide reimbursement only for the reasonable costs of providing services. Gilley and Goforth were aware of proposed legislation that would allow home health companies to be reimbursed on a "prospective pay basis." "Prospective pay" would provide home health agencies with a fixed reimbursement for services, allowing them to earn a profit if they could provide the services for a cost below the fixed reimbursement rate. Gilley and Goforth were certain that they could turn Century into a very profitable company, if home health agencies were paid on a "prospective pay basis." They were also certain, however, that Century would collapse if it continued to be paid on a "reasonable cost basis" because the company would not be able to generate enough profits to pay off its tax liabilities and debts to federal health programs. In fact, within months of forming Century, it became clear to Gilley and Goforth that Century's financial crisis was so severe that's its survival was threatened.

On August 12, 1993, Gilley and Goforth met with Century's Chief Financial Officer, Jimmy Monroe, and an outside consultant, Charles Fridell, to discuss the company's financial status. Fridell was President of PRN Home Health Management (PRN), that provided billing and financial management services to Century. During this August 12, 1993 meeting, Monroe reported on the seriousness of Century's financial crisis. Monroe reported that Century had a negative value when it was purchased by Gilley and the companies were "technically bankrupt" as of this meeting. At that time, Century owed an estimated $2.5 million to the Government, that included $1 million to the Internal Revenue Service for back payroll taxes, $1 million to Medicare, and $500,090 to Medicaid. Century also owed $1.6 million to PRN.

Gilley and Goforth Century attributed Century's history of financial problems to the fact that Century was saddled with massive debts. Century and its subsidiaries received over 80% of their revenues through reimbursements from the federal Medicare program, that did not generate profits with which to pay off accumulated debts. Moreover, some of Century's prior owners had been convicted of Medicare fraud, and Medicare authorities had disallowed cost reimbursements for some of the costs Century had incurred. As a result of these disallowances, the government's Medicare program was reimbursing Century at less than Century's actual costs of operation.

Both Gilley and Goforth testified that Century's financial burdens were so great that net monthly revenues could cover monthly bills, only if the Government debt were excluded. Without an infusion of cash, Gilley and Goforth did not believe that Century could survive (Docket Entry No. 134 at ¶ 6). To solve its financial problems, Century attempted to expand its non-Medicare business to generate revenue streams that were not limited to cost reimbursement. For example, Century sought "private pay" revenues from private insurance companies, but that effort did not expand Century's non-Medicare revenues sufficiently to address Century's financial woes.

Because Century's financial status was so precarious, the August 12th meeting was devoted to examining other options to reinvigorate the company and to keep Century a going concern. During the meeting, Fridell suggested that Century

establish an ESOP to alleviate its financial problems. Fridell informed Gilley and Goforth that Century could claim the costs of funding the ESOP as a tax deduction, thereby minimizing Century's tax burden. Fridell further stated that the costs associated with an ESOP would be reimbursed by the federal Medicare program and, therefore, the establishment of an ESOP would also provide Century with an immediate infusion of cash.

According to Fridell, Century could include the costs of funding of the ESOP in its Medicare cost reports and receive reimbursement from Medicare to cover the cost of acquiring Century stock for the ESOP. Money obtained from Medicare for funding the ESOP would then be used to purchase Century stock from Gilley and Goforth, at a fair market price determined by an independent appraisal. Gilley and Goforth then could use the funds received for their Century stock to reinvigorate the company, enabling Century to repay its debt to the government. Fridell testified that he further advised Gilley and Goforth that the withdrawal of cash from the ESOP and the deposit of Century stock must occur simultaneously.

During the meeting, Goforth initially objected to the idea of establishing the ESOP, because Century had no positive net worth, and Century and its subsidiaries "were negative net worth companies." During his deposition, Goforth admitted that he thought "the right thing to do at that time would have been to close all the companies down." In any event, Goforth agreed to the creation of an ESOP because without the tax advantages and influx of cash that would be realized from the ESOP, the only other alternative available to Century was to cease all of its business operations.

Neither Gilley nor Goforth had any prior experience dealing with an ESOP. Gilley and Goforth testified that they directed Monroe and Fridell to work with consultants to ensure compliance with ESOP laws, rules, and regulations. They further testified that Monroe did in fact retain experts to assist the company in forming the ESOP.

For his consultants, aside from Fridell, Goforth specifically remembers talking to two people at the FI's office, attorneys at the law firm of King & Ballou, and consultants at a company he was unable to identify about establishing and funding the ESOP. Goforth asserts that Fridell, Monroe, and outside attorneys advised him that Century could wait for a time after withdrawing funds from the ESOP account before depositing shares into the ESOP trust fund. Goforth admits, however, that no one ever expressly told him it would be acceptable to wait a year and a half to deposit Century stock into the ESOP trust fund. Goforth further admits that no one at the FI's office informed him that he could wait to deposit stock after withdrawing funds from the ESOP account and that he never asked anyone in the HCFA regional office in Atlanta about the ESOP.

Like Goforth, Gilley claims that he was advised by outside experts on all aspects of creating and funding the Century ESOP. Gilley also testified that Jim Peeples of the FI's office advised him that Century's plans for creating and funding the ESOP complied with Medicare regulations. Gilley concedes, however, that he never informed Peeples that Century stock would not be placed the ESOP at the same time funds were withdrawn from the ESOP account.

Gilley and Goforth could not produce any documentary evidence of advice received from any of the consultants and experts whom they consulted about the ESOP, and they declined to present the testimony of any of their consultants and experts. In any event, as Century's own-

ers, and key officers and directors, Gilley and Goforth ultimately were the ones who decided to implement this plan to establish an ESOP and to seek Medicare reimbursement of ESOP contribution costs. This decision to save Century from financial collapse was intended to keep it going long enough to find a buyer for the company.

Shortly after the August 12th meeting, Century went to work on creating the ESOP, and on September 29, 1993, the Plan was established. On or about August 30, 1995, the Internal Revenue Service determined that the Century's ESOP was a qualified employee benefit plan. Under the ESOP Plan, Century was obligated to make contributions to its ESOP trust annually in such amounts as may be determined by the Century's board of directors. The Plan makes no reference to Medicare, and defendants' funding obligation is independent of any other source of the contributions.

The Trust Agreement of September 28, 1993 that established the ESOP requires the Plan to "be administered by the Trustee for the exclusive benefit of the [ESOP beneficiaries]." The Trust Agreement further specifies that "the purchase or sale of [CHS] stock by the Trustee shall be for adequate consideration with no commission charged thereto." Gilley and Goforth agreed to be and were named Trustees of the Plan. As Trustees, they exercised discretionary authority or control over management of the Plan and or disposition of Plan's assets.

Century also appointed Goforth to serve on the Administrative Committee established under the Plan. Under the Plan document, the Administrative Committee was responsible for, among other things, maintaining accounts showing the fiscal transactions of the ESOP, Article VII, Section 7.3 at p. 35, and producing to the Trustee on or about the date upon which Century made plan contributions schedules showing the "exact amount" of the contribution "which has been allocated to the account of each Participant." Article VII, Section 7.7(e) at p. 36.

CHS submitted 22 cost reports and cost statements for fiscal years 1993 and 1994 claiming that the ESOP contribution costs were reimbursable by Medicare. Each of the 1993 and 1994 cost reports included the following certification by CHS's signatory: "to the best of my knowledge and belief, [the cost report] is a true, correct, and complete report prepared from the books and records of the provider in accordance with applicable instructions, except as noted." No exceptions were noted with respect to CHS's request for reimbursement of ESOP contribution costs. Each of the 1993 and 1994 home office cost statements included the following certification by CHS's signatory: "To the best of my knowledge and belief, [the cost statements] are true and correct statements prepared from the books and records of the Home Office in accordance with applicable instructions, except as noted (attach statement with exceptions if necessary)." No exceptions were noted with respect to CHS's request for reimbursement of ESOP contribution costs.

Based on the cost reports and cost statements, Medicare paid CHS, in total, $2,540,715 for reimbursement of ESOP contribution costs ("Medicare ESOP Payments"): $1,055,245 of the Medicare ESOP Payments were paid based on the 1993 cost reports and cost statement; and $1,485,470 of the Medicare ESOP Payments was paid based on the 1994 cost reports and cost statement, (Docket Entry No. 134, Joint Statement of Stipulated Facts and Exhibits thereto). The Medicare ESOP Payments were transmitted to Century through Medicare's interim payment program.

Preparation of Century's cost reports was assigned to Monroe, who reported directly to Goforth. Goforth and Monroe spoke frequently. Gilley also spoke with Monroe frequently, often several times daily, about Century's finances. Given that Century derived such a substantial part of its revenues from the Medicare system, Gilley and Goforth were particularly focused on the Medicare reimbursement process.

Additionally, Goforth signed on behalf of Century all of the cost reports and cost statement filed for the 1993 cost reporting period. Gilley and Goforth clearly understood that the purpose of the cost reports and cost statements was to justify Medicare reimbursement. As Century's owners, the key Century officers and Board members, and ESOP trustees, Gilley and Goforth were in a position to, and in fact did control the requests for payment by Medicare of the Medicare ESOP Payments. With respect to funding the ESOP, CHS transferred a total of $2,766,000 to the ESOP account in three transfers occurring on September 13, 1994, August 14, 1995, and August 29, 1995.

On each of these occasions, due to CHS's severe financial crunch, the funds were routed out of the ESOP and returned to CHS operating accounts within twenty four hours. On September 13, 1994, Century issued a check in the amount of $1,106,659.77 payable to Century's ESOP. This contribution was deposited into Century's ESOP's checking account on the same day. On the next day, $1,100,000 was electronically transferred back from Century's ESOP account to Century's payroll account. In August, 1995 two deposits in the total amount of $1,660,000 were made in the Plan's account representing Century's 1994 contribution to its ESOP. On August 14, 1995, Century issued a check in the amount of $1,000,000 made payable to Century's ESOP, and that

check was deposited into the Plan's account. On the same day, a counter check was issued transferring $1,000,000 from Century's ESOP to Century's account. On August 29, 1995, Century issued another check in the amount of $660,000 made payable to the Plan. That day, the check was deposited into the Plan's account. That day, $660,000 was also removed from the Plan account by a withdrawal slip signed by Goforth and deposited into Century's account.

As consideration for the September 1994 transfer of approximately $1.1 million, CHS issued promissory notes to Gilley and Goforth dated February 1, 1995. One note was executed by Goforth on behalf of CHS, and that note obligated CHS to pay Gilley $550,000. The other was executed by Gilley on behalf of CHS, and that note obligated CHS to pay Goforth $550,000. CHS made four $9,000 payments on each of the February 1, 1995 notes, for a total of $72,000. The payments were made to Gilley and Goforth on March 21, 1995, April 25, 1995, June 21, 1995, and August 29, 1995.

As consideration for the two August 1995 transfers totaling $1.66 million, CHS issued promissory notes to Gilley and Goforth dated six months earlier, February 25, 1995. One note was executed by Goforth on behalf of CHS, and that note obligated CHS to pay Gilley $830,000. The other was executed by Gilley on behalf of CHS, and that note obligated CHS to pay Goforth $830,000. These notes represent that Gilley and Goforth had already given to CHS "the proceeds from the sale to [CHS] of a certain number of ... shares of common stock ... thus creating a loan by [Gilley and Goforth] to [CHS] ..." CHS made two $13,833 payments on each of the February 25, 1995 notes, for a total of $55,332. The payments were made to Gil-

ley and Goforth on June 23, 1995 and August 30, 1995.

According to Gilley and Goforth, they did not know how many shares of Century stock they should actually deliver to Century's ESOP. Century's ESOP advisors told Gilley and Goforth that to determine the appropriate number of shares to deliver, Gilley and Goforth would need an independent appraisal as of December 31, 1993 and December 31, 1994, even though the stock was not going to be delivered until later.

In early 1994, Century retained Pat Williams, a valuation expert, to perform the required appraisal. Some point later, CHS retained a second firm, Nieman Ross & Associates, to take over for Ms. Williams.

In 1996, CHS routinely had difficulty meeting payroll expenses. Consequently, Gilley and Goforth asked their wives to make a series of short-term "bridge loans" to help CHS meet payroll. On February 15, 1996, Mrs. Goforth loaned CHS $85,000. This loan was repaid within two or three days. On April 1, 1996, Mrs. Gilley and Mrs. Goforth each loaned CHS $250,000 (for a total of $500,000). These loans were repaid by April 15, 1996. On April 18, 1996, Mrs. Gilley and Mrs. Goforth each loaned CHS $250,000 (for a total of $500,000). On June 18, 1996, Mrs. Goforth loaned CHS $300,000. All of these loans were made to help CHS meet payroll expenses.

On September 16, 1996, Century Health Services, Inc., eight of its ten subsidiary home health agencies, Gilley and Goforth closed an Asset Purchase Agreement with Integrated Health Services, Inc. ("IHS Sale"). Under the terms of the agreement, Century Health Services, Inc. and the eight home health agencies transferred to IHS the bulk of their operating assets, including the licenses or certificates which authorized them to participate in the Medi-

care system and their Medicare Provider Numbers. In exchange, IHS paid consideration of approximately $17 million, as follows:

a. IHS assumed and paid nearly all of the trade liabilities of Century Health Services, Inc. and the eight home health agencies whose assets were being purchased.

b. IHS assumed and paid $890,000 of liability owed to Medicare that had been guaranteed by CHS.

c. IHS assumed and paid $3,000,000 to resolve all of the federal tax liability incurred by CHS for unpaid payroll taxes.

d. IHS assumed and paid $1,525,000 cash in the aggregate to Mildred Goforth, Sheila Gilley, and South Holland Bank for loans they had made to cover CHS payroll expenses. Specifically, IHS paid $550,000 to Mrs. Goforth, $250,000 to Mrs. Gilley, and $725,000 to South Holland Bank. IHS's payments to the Mrs. Gilley and Mrs. Goforth satisfied promissory notes CHS had made out to them in return for their April 18, 1996 and June 18, 1996 loans described in the paragraph above. The payment to South Holland Bank satisfied a May 1, 1996 promissory note payable by CHS for which Mrs. Gilley wife had put up as collateral a certificate of deposit worth $740,000.

e. IHS paid $250,000 cash to Gilley and $250,000 cash to Goforth.

f. IHS agreed to pay up to $500,000 to resolve litigation pending against CHS and fees and expenses related thereto. To date, IHS has paid approximately $360,000.

g. IHS established a $500,000 escrow ("Escrow") as a non-exclusive source of indemnification to IHS to cover the agreement by CHS, Gilley, and Goforth, jointly and severally, to indemnify IHS

for any damage, loss, liability, deficiency, cost and expense resulting from a range of potential problems ("Losses"). The Escrow also could be used by IHS to cover a reduction in the purchase price, if such a reduction was to occur pursuant to the Purchase Price Adjustment Clause described in the paragraph immediately below. The Escrow less any Losses or claims for reduction of the purchase price were to be released to Gilley and Goforth within one year of the of the September 16, 1996, closing. (Docket Entry No. 134, Parties' Joint Stipulations of Fact at pp. 7–8).

Under the Asset Purchase Agreement, there was to be a dollar for dollar adjustment to the purchase price based upon a retrospective accounting completed within one year of the September 16, 1996, closing ("Purchase Price Adjustment"). If the accounting showed that the current liabilities of CHS exceeded their current assets by more than $6,510,000, then the purchase price paid by IHS would be reduced on a dollar for dollar basis. If, on the other hand, the excess of current liabilities over current assets was less than $5,010,000, then the purchase price would be increased on a dollar for dollar basis.

After the IHS Sale, CHS was no longer able to carry on as a health care provider and CHS was unable to generate any operating income. CHS did not receive a report assessing the value of CHS for ESOP purposes at any time prior to October 1996.

Century stock was not transferred into the ESOP until February 15, 1997, when Gilley and Goforth transferred a total of 50,937 shares to the ESOP. Gilley and Goforth transferred stock into the ESOP, at least in part, because the Department of Justice and Department of Labor met with them just a month earlier complaining about their conduct. According to Gilley and Goforth, they never encumbered, pledged, sold, or transferred their Century stock so that they would be free to deliver to the Century's ESOP the appropriate number of shares when the appraisal was completed. By the time the shares were transferred into the ESOP, however, Century's stock was virtually worthless.

CHS's claims for Medicare reimbursement of ESOP contribution costs for the 1994 Plan year were audited prior to the IHS Sale. This field audit was conducted onsite at CHS for two weeks in November 1995. Jeff Harpin was responsible for conducting the onsite audit of the Century ESOP on behalf of the FI.

One of the directives Harpin received from the FI was to determine if the ESOP liability had been liquidated in a timely fashion. When Harpin asked if the 1994 ESOP liability had been liquidated, Harpin was told that it had. When Harpin asked for documentation that the liability had been liquidated, he was given copies of the two checks that had been deposited in the ESOP, the proceeds of which were transferred back to Century within 24 hours. Harpin was not told that the funds had been immediately removed from the ESOP account. Nor did Century provide Harpin with bank records showing that the ESOP account was virtually empty. Harpin did not ask if the funds remained in the ESOP because he assumed that Century would have informed him if the funds had been removed.

Harpin was also directed to determine if an independent appraisal on Century stock had been completed for the ESOP. When Harpin requested documentation of the stock appraisal, Century provided him with a copy of a fax from an appraisal firm stating that the appraisal was in progress.

Because Harpin believed that the ESOP liability had been liquidated, the appraisal was in the process of being completed, and the ESOP otherwise complied with Medi-

care rules, Harpin recommended a qualified approval of the ESOP expense pending receipt of the appraisal. If Harpin had known the ESOP account was empty, he would have recommended that the ESOP expense be disallowed

*Medicare Regulations*

The United States Department of Health and Human Services (HHS), Health Care Financing Administration (HCFA), is responsible for the administration and supervision of Medicare Part A. To assist in the administration of Medicare home health benefits, HHS contracted with "regional home health intermediaries" (FIs). 42 U.S.C. § 1395h.

Congress defined "reasonable costs" generally, and delegated to the Secretary of HHS responsibility for fleshing out Medicare cost reimbursement policies. This responsibility has been assigned to HCFA, that publishes a substantial amount of written policy guidance as to what are and are not considered by the Medicare system to be reasonable costs. The published guidance includes the Provider Reimbursement Manual (PRM) and Intermediary Letters (ILs).

HCFA personnel are routinely available to, and do, answer questions from FIs and healthcare providers and their agents about HCFA's cost reimbursement policies. The FIs apply policies set by HCFA. FIs have no policy making authority.

Medicare makes interim payments throughout the year to authorized home health care providers based on estimated costs. 42 C.F.R. § 413.60 (1995).

Many home health agency chains have a central or "home" office that provides administrative and centralized management services to individual agencies within the chain. Under Medicare Part A, within a specified time after the fiscal year ends, home offices must submit a "cost statement" and agencies must submit a "cost report" detailing their actual costs. 42

C.F.R. § 413.20(b) (1995). In cost statements and cost reports, health care providers are to detail all of their costs. They are to apportion these costs between services furnished to eligible Medicare beneficiaries and non-Medicare patients. They should claim for Medicare reimbursement only "reasonable costs" of services furnished to eligible Medicare beneficiaries.

HHS, through its FIs, reviews cost reports, cost statements, and other financial representations of agencies and home offices, and makes retroactive adjustments to amounts previously paid to home health care providers. 42 C.F.R. §§ 413.60, 413.64(f) (1995). If interim payments exceeded actual, reimbursable costs, i.e. "allowable" costs, a year-end adjustment is due in favor of the Government.

Contributions to an Employee Stock Ownership Plan (ESOP) as deferred compensation for home office and agency employees are allowable under Medicare policies when and to the extent such costs are "actually incurred" by the home office and agency. PRM § 2141.2; *see also* 42 C.F.R. §§ 413.1, 413.5, and 413.9 (regarding reasonable costs). Such costs are not "incurred" unless, among other things, the home office and agency adhere to the following rules:

1. The ESOP contribution must be "made for the sole benefit of participating employees," PRM §§ 2140.3A, 2141.2, 2141.3A; 2141.3B, 2140.3B.

2. Should the health care provider seek to make its contributions to the plan via a transfer of stock, the value of stock transferred to the plan is determined as of the date of transfer. PRM §§ 2140.4, 2141.2, 2141.4.

3. Medicare allows health care providers to seek reimbursement of, and include in cost reports and costs statements, costs that were accrued

but not yet paid during the cost reporting period. However, these accrued costs must be paid within one year of the end of the cost reporting period. A two year extension is permitted, for a total of up to three years to pay the accrued liability, if the provider submits a written request for extension to the FI and the FI finds good cause to grant the extension. If the provider fails to pay accrued liabilities within the applicable one or three year deadline, the accrued cost is not allowable, i.e., not reimbursable by Medicare. PRM §§ 2305, 2141.4, 2140.4

4. If plan assets are involved in transactions, the plan may not pay more than "adequate consideration" for stock, and "all assets accumulated by the plan must be distributed exclusively to the participating employees or their beneficiaries." PRM §§ 2140.3.C.1, 2141.2, 2141.3.C.1.

All of these reimbursement policies have been in force since March 1, 1976. PRM 2141.7;. IL 76–17. The rules set forth in IL 76–17 were codified as Section 2144 of the PRM in July, 1996.

If the ESOP contribution is not made for the sole benefit of the ESOP beneficiaries or if the health care provider fails to pay an accrued liability timely, or otherwise comply with Medicare's cost reimbursement rules, the provider is in receipt of Medicare funds to which it is not entitled. The provider, therefore, should notify the FI of this fact, and remove the non-reimbursable cost from the cost report or cost statement on which the cost is claimed.

## B. CONCLUSIONS OF LAW

The Government's first four claims are under the FCA. The FCA imposes liability upon those who knowingly submit a false claim to the government or knowingly make or a false record or statement to conceal or avoid repayment of an existing obligation to the government. 31 U.S.C. § 3729. Specifically, the Government asserts that Defendants are liable under 31 U.S.C. §§ 3729(a)(1), (2), (3) and (7) that provide that anyone who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

\*     \*     \*     \*     \*     \* .

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

31 U.S.C. § 3729(a).

For purposes of the FCA, a person acts knowingly if he: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)–(3). When Congress amended the FCA in 1986, Congress specifically provided by statute that "[N]o proof of specific intent to defraud is necessary." *Id.* Thus, reckless

disregard has been construed as "an extreme version of ordinary negligence" rather than as a "lesser form of intent." *United States v. Krizek,* 111 F.3d 934, 942 (D.C.Cir.1997). Simple negligence and innocent mistakes, however, do not rise to the level of scienter required by the FCA. *See United States v. Boeing Co.,* 100 F.Supp.2d 619, 626 (S.D.Ohio 2000).

■ To prevail under 31 U.S.C. § 3729, the Government must prove the elements of each cause of action by a preponderance of the evidence. 31 U.S.C. § 3731(c). To establish liability under 31 U.S.C. § 3729(a)(1), (2), the Government must prove: (1) that Defendant made a claim, or made a statement in order to get the Government to pay money on a claim; (2) that the claim or statement was false or fraudulent; and (3) that Defendant knew that the claim or statement was false or fraudulent.[3] *Boeing Co.,* 100 F.Supp.2d at 625 (citing *Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir.1999)); *United States v. Borgess Medical Ctr.,* 98 F.Supp.2d 822, 826–27 (W.D.Mich.2000).

■ To prevail on claim under § 3729(a)(3), the Government must prove: (1) that the defendant knowingly conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States and (2) that one or more of the conspirators performed any act to effect the object of the conspiracy. *United States ex rel Durcholz v. FKW Inc.,* 997 F.Supp. 1143, 1158 (S.D.Ind.1998); *see also United States v. Murphy,* 937 F.2d 1032, 1038 (6th Cir.1991). As with any civil conspiracy, the Government must prove the existence of an agreement to achieve the objective of the conspiracy and that the defendant was a participant in the conspiracy. *See Murphy,* 937 F.2d at 1039.

■ Finally, to sustain a reverse false claim under 31 U.S.C. § 3729(a)(7), the Government must show (1) that the Defendants made, used or caused to be used a statement or record to conceal, avoid or decrease an obligation to the United States; (2) that the statement or record was false or fraudulent; (3) that the Defendant knew the statement or record was false or fraudulent; and (4) that the Defendant "made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law." *American Textile Manufacturers Inst., Inc. v. The Limited, Inc.,* 190 F.3d 729, 737 (6th Cir.1999). In *The Limited, Inc.,* the Sixth Circuit cited the following examples as obligations clearly encompassed by the FCA: acknowledgements of indebtedness, judgments, and breaches of contract. *Id.* The Sixth Circuit went on to hold, however, that "[a] statute or regulation might also impose a duty to pay or transmit property, and breaches of such a duty might expose a defendant to liability under the reverse false claims provision." *Id.*

The Government has identified three sets of statements or records that form the bases of their claims under the False Claims Act: 1) the 1993 cost reports, 2) the 1994 cost reports, and 3) Century's representations during the 1994 audit that the ESOP liabilities had been liquidated in a timely manner.

■ Regarding the first element of a FCA claim under 31 U.S.C. §§ 3729(a)(1), (2) and (7), the parties do not dispute that the 1993 and 1994 cost reports were submitted to the FI to obtain Medicare funds. The parties have stipulated, moreover, that based upon these cost reports, the federal

---

**3.** This Court has held the government need to prove actual damages in order to prevail on a claim under the FCA. *See U.S. ex rel. Pogue v.* *American Healthcorp, Inc.,* 914 F.Supp. 1507, 1509 (M.D.Tenn.1996) (Echols, J.).

government paid Century $1.05 million in 1993 and $1.49 in 1994 to reimburse Century for the costs of funding the ESOP. As for Century's representations to the FI auditor that the ESOP liability had been liquidated and the presentation of copies of cancelled checks showing deposits into the ESOP account, the Court concludes that these representations were made to the FI to avoid an obligation to repay funds received from Medicare for ESOP reimbursement.

Defendant Goforth signed the 1993 cost reports and reviewed the 1994 cost reports. Goforth directly supervised Monroe, who signed the 1994 cost reports and represented to the FI auditor that the 1994 ESOP liabilities had been liquidated. Goforth also signed the checks that were routed through the ESOP account with Gilley's acquiescence. Both Gilley and Goforth were intimately involved in the Medicare reimbursement process and acted in their capacities as Century's officers. Accordingly, the Court finds that Defendant Goforth presented the 1993 cost reports for payment by Medicare. Additionally, the Court finds that Defendants Gilley, Goforth, and Century caused to be presented the 1993 and 1994 cost reports Medicare reimbursement as well as Century's representations to the FI auditor that were intended to prevent the recoupment of Medicare funds. Thus, the Court concludes that the Government has met its burden of establishing the first element of a False Claims Act claim under 31 U.S.C. §§ 3729(a)(1), (2) and (7) with respect to Goforth, Gilley, and Century.

The parties dispute whether the Government has established falsity and scienter, the second and third elements of a False Claims Act claim under 31 U.S.C. §§ 3729(a)(1), (2) and (7). The Court next examines the issue of falsity.

The Government asserts that the 1993 and 1994 cost reports fraudulently induced the FI to provide $2.54 million to Century for non-allowable ESOP costs. The Government contends that the ESOP expenses for which Century requested reimbursement were non-allowable because Century failed to liquidate its liability for the ESOP costs within one year as required by PRM § 2305 and because the reimbursement that Century received from Medicare for ESOP costs was not used for the sole benefit of the employees participating in the ESOP as required by PRM §§ 2140, 2141, 2144, and IL 76–17. The Government further asserts that Century misled the FI auditor who was responsible for determining whether the ESOP liability had been liquidated timely by giving him copies of checks showing that funds had been deposited into the ESOP without informing the auditor that the funds were withdrawn from the ESOP less than 24 hours after the checks were deposited.

The Defendants counter that the certifications in the 1993 and 1994 cost reports were not false because Century timely liquidated its liability by depositing checks in the ESOP within the one year allowed by Medicare regulations. Defendants further argue that Medicare regulations do not state that stock must be simultaneously transferred into an ESOP when funds are transferred out the ESOP account and that, in any event, they personally held the stock in trust pending an appraisal. Finally, Defendants assert that Century's employees were directly benefitted by the transfer of funds from the ESOP into Century's operating account because the company would have gone under otherwise and the employees would have lost their jobs. Defendants also assert that they never personally benefitted from the transfer of funds from the ESOP to Century.

As the Seventh Circuit has recognized, the issues of scienter and falsity in an FCA action are closely related. *See U.S. ex rel.*

*Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir.1999). Thus, courts have held that errors based upon flawed reasoning and differences in interpretation of disputed legal questions are not false under the FCA. *Id.* (citing *Wang v. FMC Corp.,* 975 F.2d 1412, 1420–21 (9th Cir. 1992) and *Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1477–78 (9th Cir.1996)). Courts have held, however, that the government can prove falsity if it establishes that the defendant's interpretation of a regulation or contract provision is unreasonable. *See, e.g., Commercial Contractors, Inc. v. United States,* 154 F.3d 1357 (Fed.Cir.1998); *United States v. Krizek,* 859 F.Supp. 5, 11 (D.D.C.1994) *aff'd* 111 F.3d 934 (D.C.Cir.1997).

According to the credible testimony of the Government's witnesses, Century's liability for the ESOP could not be considered liquidated if the ESOP did not contain assets equivalent to the amount of funds provided by Medicare at the end of the applicable one-year period.[4] Other than their own testimony, Defendants do not present any evidence to support their assertion that liquidation of liabilities rule set forth in PRM § 2305 was satisfied simply by a check in the ESOP account even if the funds were immediately withdrawn with no benefit accruing to the ESOP. Defendants' interpretation of PRM § 2305 is controverted by the plain language of PRM § 2305, which states "[w]here liquidation is made by check or other negotiable instrument, these forms of payment must be redeemed though an actual transfer of the provider's assets within the time specified in this section."

Based upon the testimony presented and the plain language of PRM § 2305, the Court concludes the Defendants' interpretation of the liquidation of liabilities rule is unreasonable. The Court further concludes that Defendants did not liquidate their ESOP liabilities timely in accordance with PRM § 2305 because the ESOP did not contain assets equal to the funds provided by Medicare at the end of the one year period.

Defendants' argument that they personally retained Century stock in trust pending an appraisal is unavailing. Defendants are sophisticated businessman who are knowledgeable on Medicare policies, and Defendant Gilley is a licensed attorney. Therefore, the Court finds it unreasonable for them to assert that holding the stock personally was equivalent to placing the stock into the ESOP trust account.

The Court further concludes that Defendants did not operate the ESOP for the sole benefit of Century's employees. Century's three transfers of the Medicare ESOP Payments to Century's ESOP were on September 13, 1994, August 14, 1995, and August 29, 1995. On each of these occasions, the funds were routed out immediately of Century's ESOP and returned to Century's operating accounts within twenty four hours. On September 13, 1994, Century issued a check in the amount of $1,106,659.77, which was deposited into the Plan account. On September 14, 1994, $1,100,000 was transferred from the Plan account to the payroll account of Century. On August 14, 1995, Century issued a check in the amount of $1,000,000, which was deposited into the Plan account. On August 14,1995, $1,000,000 was transferred from the Plan to Century. On August 29, 1995, Century issued a check in the amount of $660,000, which was deposited into the Plan account. On August 29, 1995, $660,000 was transferred from the Plan to Century account.

---

4. Under PRM §§ 2305, 2306, providers may liquidate their liabilities after the one-year period has expired if they request and receive an extension from the FI. Century, however, never requested an extension.

Although the $2.76 million had been routed through Century's ESOP in 1994 and 1995, neither Gilley nor Goforth transferred any Century stock to the Plan until February 15, 1997, when Gilley and Goforth gave 50,937 shares to Century's ESOP. Gilley admits this transfer occurred, at least in part, because the Department of Justice and Department of Labor met with them just a month earlier complaining about their conduct. Gilley also admits Century's ESOP did not receive any benefit from the Medicare ESOP Payments.

In light of the IHS Sale, at the time of the 1997 transfer to the Plan, the value of Century's stock was substantially reduced, as Defendant Gilley concedes. Thus, Century's ESOP contribution costs were not "made for the sole benefit of participating employees" and Century's ESOP did not receive "adequate consideration" for the Medicare ESOP payments.

Accordingly, the Court concludes that these undisputed facts establish that Gilley's and Goforth's decision to use Century's ESOP funds were primarily and substantially for the benefit of Century, Gilley and Goforth. Gilley and Goforth's self-dealings are clearly established by these facts and constitute a violation of the sole benefit rule set forth in PRM §§ 2140, 2141, 2144, and IL 76–17.

Defendants' argument that Century's employees benefitted from the transfer of ESOP funds into Century's operating account because Century would have been forced to cease operations without the funds is meritless. Defendants' failure to place appropriate assets in the ESOP at the time the Medicare funds were withdrawn deprived Century's employees of the benefits that flow from an ESOP Plan. By the time Defendants deposited stock into the ESOP, that stock was worthless because Century's assets had been sold to IHS. These defendants clearly did not act

with interest of their employees, the Plan's participants.

The Court recognizes that the PRM does not specifically state that the stock must be simultaneously deposited in the ESOP at the time funds are withdrawn. The Court does not believe, however, that a reasonable person could interpret the applicable Medicare regulations as allowing for more than a few months lag between the withdrawal of funds and the transfer of stock. Indeed, Pat Williams, the appraiser initially retained by Century testified that in her extensive experience, she had only known one other company to wait more than a few months before transferring stock.

Based upon the foregoing, the Court concludes that Century did not liquidate its ESOP liability timely as required by PRM § 2305 and that the ESOP was not operated for the sole benefit of the employees as required by PRM §§ 2140, 2141, 2144, and IL 76–17. Therefore, the Court concludes that the 1993 and 1994 cost reports requesting reimbursement requesting reimbursement for ESOP expenses as allowable costs were false or fraudulent for purposes of assessing liability under the FCA.

The Court also notes that in its 1993 and 1994 cost reports Century certified that "to the best of my knowledge and belief, [the cost report] is a true, correct, and complete report prepared from the books and records of the provider in accordance with applicable instructions, except as noted." By making this certification, Defendants represented that they would continue to comply with the Medicare regulations governing the allowability of ESOP expenses or notify the FI that the ESOP expenses had become nonallowable by virtue of their failure to comply with such regulations. The Government presented uncontroverted testimony that

providers who request reimbursement for accrued expenses in their costs reports are required to file an amended cost report if they fail to liquidate their liability in a timely manner or the provider determines that an expense for which they requested reimbursement was nonallowable.[5] "The withholding of such information—information critical to the decision to pay—is the essence of a false claim." *Ab-Tech Construction, Inc. v. United States*, 31 Fed.Cl. 429, 434 (1994). As this Court held in *Pogue*, "it is clear that the False Claims Act was intended to cover not only those situations in which the claims themselves are false but also those situations in which a claimant engages in fraudulent conduct with the purpose of inducing payment by the government." 914 F.Supp. at 1511. Thus, the Court also concludes that the false 1993 and 1994 cost reports represent false claims under the FCA based upon the false certifications therein.

Because Century failed to liquidate its ESOP liability properly, the Court necessarily concludes that Century's representations of compliance with PRM § 2305 during the FI's audit, including its withholding of bank records documenting the balance of the ESOP account, were likewise false.

The Court next considers the issue of scienter. The Government asserts that in submitting the 1993 and 1994 cost reports requesting reimbursement for ESOP as allowable Medicare expenses and in representing to the FI auditor that Century's 1994 ESOP expenses were allowable, Defendants acted with deliberate ignorance or reckless disregard of the falsity of these statements. In response, Defendants assert that they reasonably believed that the

ESOP expenses were allowable at the time the 1993 and 1994 cost reports were submitted and when they routed the checks through the ESOP and that they did not affirmatively mislead the FI auditor. According to the Defendants, they were advised by the FI's office and outside experts that their actions with respect to the ESOP complied with applicable Medicare regulations. Defendants also argue that they could not put stock into the ESOP until an appraisal was completed.

The Court finds Defendants' arguments unpersuasive. As discussed above, Defendants could not reasonably believe that they timely liquidated their ESOP liabilities by routing money through the ESOP into Century's operating account without putting stock into the ESOP. Nor does the Court believe that any person in the FI's office or other outside expert advised Defendants that it would be acceptable to deposit a check into the ESOP, immediately withdraw the funds, and then wait years to place stock back into the ESOP. Defendants did not produce the testimony of these outside experts, nor did they testify credibly as to the information provided to these experts from whom they sought advice. Defendants cannot assert good faith reliance on expert advice unless they can show that they provided the expert with all of the necessary information to provide an informed opinion.

Although Defendants contend that Fridell devised the check-routing scheme and assured them that it was proper, Fridell testified that he advised Defendants that stock must be placed in the ESOP at the time funds were withdrawn from the ESOP account. In spite of Fridell's ad-

---

**5.** Century's familiarity with this requirement is demonstrated by the fact that amended reports were filed for the 1994 cost reporting year October 24, 1995 for reasons that were not specified at trial (Docket Entry No. 134,

Ex. A to Joint Stipulation of Facts). Century, however, did not notify the FI that the ESOP should be disallowed in these amended 1994 cost reports.

vice, Defendants withdrew funds from the ESOP without providing the ESOP with assets of comparable value.

Knowing that the ESOP was not funded, Defendants then misrepresented to the FI auditor that the 1994 ESOP liabilities had been timely liquidated. Although the FI auditor did not request copies of bank records, Defendants surely knew that but for their representations, the auditor would have requested copies of cancelled checks to document deposits into the ESOP account for the purpose of determining whether Defendants had in fact liquidated their ESOP liability. Therefore, Defendants should have informed the FI auditor that they had removed the Medicare funds from the ESOP account or provided him with bank records for the ESOP.

Defendants' argument that they could not put stock into the ESOP until an appraisal was completed disregards the fact that they did not do anything to ensure that the appraisal was completed in a timely manner. Defendants did not even retain a firm to perform the appraisal until August, 1994, several months after the 1993 cost reports were submitted. (Government Exhibit No. 17, Williams Engagement Ltr.). Williams informed Defendants that Century's appraisal was being held up pending payment for her services and receipt of information that she had requested. *Id.* Thus, when Defendants submitted their 1994 cost reports in March, 1995, they knew that an appraisal was not even close to being completed. (Government Exhibit No. 16, Williams Chronology). In fact, in October, 1995— more than a year after Defendants first routed Medicare funds through the ESOP—Williams was still waiting for Century to provide information necessary for her to complete the appraisal. (Government Exhibit No. 16, Williams Request for Information). Defendants concede, more-

over, that they placed a low priority on obtaining money for the appraisal.

Finally, the Court notes that both Gilley and Goforth testified that they were familiar with and had read parts of the PRM. Furthermore, Defendant Goforth testified that he read materials prepared by HCFA and the FI and also attended several seminars to ensure he was familiar with the rules governing Medicare reimbursement.

Gilley's and Goforth's testimony, together with other evidence presented at trial, clearly demonstrates that Defendants knew: 1) that the purpose of the cost reports was to justify reimbursement from Medicare; 2) that Century was required to file an amended cost report if it determined that Medicare had provided reimbursement for nonallowable costs; 3) that Century was required to fund the ESOP within the time prescribed by PRM § 2305; 4) that Medicare would only reimburse costs for the ESOP if the Plan was operated for the sole benefit of the employees; 5) that stock sold to the ESOP must amount to adequate consideration; 6) that an appropriate amount of stock had to be placed in the ESOP when funds were withdrawn; 7) that an appraisal was necessary to determine the amount of stock to place in the ESOP; 8) that at the time the 1993 and 1994 cost reports were submitted the appraisal was far from complete; 9) that the money received from Medicare to fund the ESOP would have to be used as a cash infusion for Century; and 10) that presenting copies of cancelled checks to the FI auditor without informing that Medicare funds had been withdrawn would lead the auditor to assume that the ESOP had been funded.

With these collective facts, Defendants realized that they only way they could use the ESOP to provide a cash infusion to Century was to sell the ESOP their stock and loan the money back to Century. De-

894

fendants further understood that the only way they could sell their stock to Century was by obtaining an independent appraisal informing them how many shares would be adequate consideration for the funds they received from the ESOP. But when they submitted their 1993 cost reports, Defendants knew that the appraisal was not close to being completed. Defendants clearly intended to use the ESOP funds provided by Medicare to prop up Century whether they obtained an appraisal in time to deposit stock simultaneously into the ESOP at the time the funds were withdrawn from the Plan. Whether Defendants ever intended to deposit stock in the ESOP is questionable. Defendants never really pursued the appraisal and only deposited stock in the ESOP after they were contacted by the Department of Justice. Moreover, by the time the 1994 cost reports were filed, Defendants knew that they had failed to liquidate their 1993 ESOP liabilities and had to realize they would not be able to liquidate any liabilities incurred for ESOP expenses, yet they requested continued reimbursement for funding the ESOP. Then to cover up their failure to liquidate Century's 1993 and 1994 ESOP liabilities, Defendants deliberately mislead the FI auditor.

Based upon the foregoing, the Court concludes that Defendants acted knowingly for purposes of the FCA when they submitted the 1993 and 1994 cost reports to Medicare seeking reimbursement for ESOP expenses as allowable and certifying their present and future compliance with applicable Medicare regulations. Defendants also acted knowingly when they represented to the FI auditor that the 1994 ESOP expenses had been liquidated.

In sum, the Court concludes that Defendants engaged in a fraudulent course of conduct to induce Medicare to pay Century for nonallowable ESOP expenses and then fraudulently concealed their obligation to repay those funds. Consequently Defendants are liable under 31 U.S.C. § 3729(a)(1) for knowingly presenting the 1993 and 1994 cost reports to the FI to secure payment for nonallowable expenses and are liable under 31 U.S.C. § 3729(a)(2) for knowingly using the 1993 and 1994 cost reports to secure payment for nonallowable expenses. Finally, defendants are also liable under § 3729(a)(7) for fraudulently concealing from the auditor that the Century's 1994 ESOP liabilities had not been liquidated and that the ESOP account was empty as the Court concludes that Defendants had a duty to repay the funds Century received from Medicare. *See The Limited, Inc.,* 190 F.3d at 737. The Court, however, declines to find the Defendants liable under 31 U.S.C. § 3729(a)(3) for conspiring to have Medicare pay Century for nonallowable expenses because the Government failed to address this claim in its proposed findings of fact or its closing argument.

■ Having determined that Defendants violated the FCA, the Court must now determine the extent of their monetary liability. As previously stated, the FCA provides for treble actual damages and civil penalties of $5,000 to $10,000 per false statement. 31 U.S.C. § 3729(a). The government must prove actual damages by a preponderance of the evidence. 31 U.S.C. § 3731. Here, the Government contends that the United States suffered damages in the amount of $2.54 million. In support of their damages calculation, the Government argues that Medicare provided Century with $1.05 million for 1993 and $1.49 million for 1994 to fund an ESOP for Century's employees, and the ESOP never received adequate consideration for these funds. The parties stipulate that Century received a total of $2.54 million from Medicare to reimburse the company for the costs of funding an ESOP

based upon the 1993 and 1994 cost reports. Medicare did not receive adequate consideration for the funds provided to Century for the ESOP because the stock placed in the ESOP is worthless. Furthermore, Medicare was denied the opportunity to recoup the $2.54 million provided to Century based upon Defendants' misleading representations during the audit by the FI. Thus, the Court finds that the United States has sustained $2.54 million in actual damages. The Government is therefore entitled to $7.62 million, treble the amount of damages sustained by the United States. *See* 31 U.S.C. § 3729(a).

Turning to the issue of civil penalties, the Government requests that the Court hold Defendants liable for 42 false violations of the FCA and impose a $10,000 penalty for each violation. According to the Government, the nine cost reports submitted for 1993 constitute nine false claims and nine false statements; the 11 cost reports submitted for 1994 constitute 11 false claims and 11 false statements; and the cost statements submitted for Century's home office for 1993 and 1994 constitute 2 false statements.

Under 31 U.S.C. § 3729(a), separate statutory penalties are to be assessed for each false claim. Where it is alleged that a defendant has made multiple false claims, the court must determine "[w]ith what act did the defendant submit his demand or request and how many such acts were there?" *Krizek,* 111 F.3d at 939. Thus, separate penalties are to be assessed for each request for payment, rather than for each false statement. *Id.* at 939–940. Here, each cost report filed by Century represents only one request for payment, even though each cost report constitutes a false claim under 31 U.S.C. § 3729(a)(1) and a false statement under 31 U.S.C. § 3729(a)(2). Further, the cost statements filed for the home office in 1993 and 1994 do not represent a demand for payment, but simply reflect how Century calculated overhead costs that were then apportioned to its operating agencies. Consequently, the Court will assess civil penalties for only 20 false claims. Although the Government requested the maximum civil penalty of $10,000 be imposed for each false, it did not present any basis for its request. The Court will impose a fine of $5,000 per false claim for a total of $100,000. This sum should sufficiently cover the Government's costs for investigating and prosecuting this action. *See United States v. Peters,* 927 F.Supp. 363, 368 (D.Neb.1996) (citing *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989)).

Defendants Gilley and Goforth appear to argue that they should not be held liable for any damages or penalties because they did not personally benefit from the Medicare funds provided for the ESOP. This argument lacks merit. "Corporate officers are liable, in their individual capacity, under the FCA if they knowingly make false claims for payment to the United States on behalf of the corporation." *United States v. Advance Tool Co.,* 902 F.Supp. 1011, 1016, n. 4 (W.D.Mo.1995) (citing *U.S. v. Entin,* 750 F.Supp. 512 (S.D.Fla.1990)); *see also U.S. ex rel. Haskins v. Omega Institute, Inc.,* 11 F.Supp.2d 555, 565–65 (D.N.J. 1998). Conversely, corporations may be held liable under the FCA for the actions of their officers, directors or employees. *See U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.,* 961 F.Supp. 1288, 1292 (E.D.Mo.1997) (collecting cases). Under the FCA individuals and corporations can be held jointly and severally liable. *See United States v. Cabrera–Diaz,* 106 F.Supp.2d 234, 242 (D.P.R.2000). Therefore, the Court finds the Defendants jointly and severally liable for treble damages of $7.62 million and $100,000 in civil penalties.

Counts V and VI assert claims for common law unjust enrichment and common law claim of payment by mistake against the defendants. Because any recovery for these claims would be duplicative, Counts V and VI are dismissed.