*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0160P (6th Cir.)
File Name: 02a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
ex rel.; EDWARD T.
AUGUSTINE,
       *Plaintiffs-Appellees,*

     *v.*

CENTURY HEALTH SERVICES,
INC., et al.,
       *Defendants-Appellants.*

No. 01-5019

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 96-01048—William J. Haynes, Jr., District Judge.

Argued: March 19, 2002

Decided and Filed: May 7, 2002

Before: SILER and GILMAN, Circuit Judges;
HEYBURN, Chief District Judge.[*]

_____

[*]The Honorable John G. Heyburn II, Chief United States District
Judge for the Western District of Kentucky, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:** William P. Suriano, LAW OFFICES OF WILLIAM P. SURIANO, Riverside, Illinois, for Appellants. Michael D. Taxay, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** William P. Suriano, LAW OFFICES OF WILLIAM P. SURIANO, Riverside, Illinois, for Appellants. Michael D. Taxay, Douglas N. Letter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Robert T. Bateman, BATEMAN & BATEMAN, Clarksville, Tennessee, for Appellees.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. Century Health Services, Inc. (CHS), a holding company for a number of home healthcare agencies, established an Employee Stock Ownership Plan (ESOP) in 1993 and appointed its top two officers, George Gilley and Bill Goforth, to serve as the trustees. CHS later submitted Medicare cost reports to the Health Care Financing Administration (HCFA) in order to be reimbursed for the company's anticipated contributions to the ESOP as a component of employee expenses. Based upon these cost reports and other submitted documents, the government paid CHS a total of $2,540,715 in 1994 and 1995. CHS used the HCFA payments to contribute over $2,760,000 to the ESOP during the two years in question. But because substantially all of these contributions were promptly withdrawn by CHS for its general corporate use, the government claims that CHS, Gilley, and Goforth (collectively, the defendants) obtained and kept the Medicare funds in violation of the False Claims Act (FCA). After a bench trial, the district court held the defendants liable for $7.62 million in treble damages ($2,540,715 x 3) and

$100,000 in civil penalties pursuant to the FCA. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Factual background

CHS established an ESOP on September 29, 1993. The trustees of the ESOP were George Gilley, the Chairman of the Board of CHS, and Bill Goforth, the President and CEO of CHS. As a healthcare agency, CHS was eligible for reimbursement by the HCFA for ESOP contributions when and to the extent those costs were "actually incurred." Provider Reimbursement Manual 2141.2; 42 C.F.R. §§ 413.1, 413.5, and 413.9. In order to be reimbursed by the HCFA, however, a healthcare agency has to submit cost reports and cost statements. *Id.*

The district court found that CHS submitted

22 cost reports and cost statements for fiscal years 1993 and 1994 claiming that the ESOP contribution costs were reimbursable by Medicare. Each of the 1993 and 1994 cost reports included the following certification by CHS's signatory: "to the best of my knowledge and belief, [the cost report] is a true, correct, and complete report prepared from the books and records of the provider in accordance with applicable instructions, except as noted." No exceptions were noted with respect to CHS's request for reimbursement of ESOP contribution costs.

*United States v. Century Health Servs., Inc.*, 136 F. Supp. 2d 876, 882 (M.D. Tenn. 2000) (alteration in original). Based on these submissions, the HCFA paid CHS a total of $2,540,715.

CHS contributed the following amounts to the ESOP: $1,106,659.77 on September 13, 1994, $1,000,000 on August 14, 1995, and $660,000 on August 29, 1995. On either the

same or the next day after each contribution was made, however, all but $6,659.77 was transferred back to CHS: $1,100,000 on September 14, 1994, $1,000,000 on August 14, 1995, and $660,000 on August 29, 1995. The total amount thus removed from the ESOP was $2,760,000. CHS issued promissory notes to the ESOP as consideration for each of these transfers, providing that the amounts owed would be paid in CHS stock of equivalent value.

The government conducted a field audit of CHS's claims for Medicare reimbursement in November of 1995. During this audit, the defendants reported that they had deposited two checks into the ESOP account in August of 1995. The auditor was not told, however, that the funds had been transferred back to CHS on the same day that they were deposited into the ESOP.

On September 16, 1996, before CHS had delivered any stock in satisfaction of the promissory notes, CHS and eight of its ten subsidiary home healthcare agencies transferred the bulk of their operating assets to Integrated Health Services, Inc. (IHS). As part of their agreement, IHS assumed and paid significant liabilities owed by CHS and the eight subsidiary home healthcare agencies.

CHS finally transferred 50,937 shares of its stock to the ESOP, in purported satisfaction of the promissory notes, on February 15, 1997. The number of shares was determined by an appraisal of the shares' value as of the end of 1993 and 1994, the years in which the $2,760,000 was transferred from the ESOP to CHS, not on the basis of the shares' fair market value in 1997. As a result, the appraisal did not take into account CHS's September 16, 1996 sale of assets to IHS.

**B.   Procedural background**

This lawsuit was initially filed by Edward T. Augustine pursuant to the *qui tam* provisions of the FCA. The Department of Justice later intervened. On May 13, 1997, the Secretary of the United States Department of Labor also filed

In other words, although the causes of action underlying these two cases are interrelated, they arose independently. This case is thus distinguishable from those lawsuits where the election-of-remedies doctrine is properly invoked to prevent a double recovery based on two causes of actions that arose from the same wrong. *See, e.g.*, *Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 566-67 (6th Cir. 2001) (noting that the election-of-remedies doctrine "is remedial in nature and does no more than prevent double recovery").

### III.   CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

district court denied the defendants' motion for summary judgment. The district court pointed out that "[t]he FCA action asserts claims for injury to the Medicare Trust Fund," whereas the "ERISA action seeks restitution to the [] ESOP, based on defendants' breach of their fiduciary duties to the [ESOP]."

Preventing "double . . . recoveries for the same wrong" is the primary purpose of the election-of-remedies doctrine. *Gens v. Resolution Trust Corp.*, 112 F.3d 569, 573 (1st Cir. 1997) (internal quotation marks omitted). Although the ERISA and FCA actions are related, they do not stem from the same wrong. The FCA action stems from the false claims that the defendants submitted to the HCFA. It was brought by the Department of Justice so that the government could recover the $2,540,715 that the HCFA had disbursed to CHS based on the company's false claims. The ERISA action, on the other hand, stems from the defendants' failure to compensate the ESOP for $2,760,000 that they withdrew from it during 1994 and 1995. As a result, the Secretary of Labor's recovery of the $2,760,000 benefits CHS's employees rather than the government itself.

These two cases are thus based on different wrongs. The Department of Justice would have had grounds for an action under the FCA even if the defendants had eventually reimbursed the ESOP for the funds that were withdrawn from it in 1994 and 1995. Its action was based instead on the defendants' overall lack of compliance with the implied certification they made when they submitted cost reports to the HCFA in 1994 and 1995.

CHS's employees, on the other hand, would have had grounds for a lawsuit under ERISA even if CHS had not submitted any claims—whether true or false—to the HCFA. As the district court noted, the ESOP "makes no reference to Medicare, and defendants' funding obligation is independent of any other source of the contributions." *Century Health Servs., Inc.*, 136 F. Supp. 2d at 882.

a complaint under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, against the same defendants, alleging that they had breached their fiduciary duties to the ESOP. The two cases were later consolidated for discovery and trial.

The defendants filed a motion for summary judgment on the ground that the government, by filing lawsuits under both ERISA and the FCA, was pursuing inconsistent remedies. Following oral argument, the district court denied the defendants' motion, holding that the election-of-remedies doctrine was inapplicable because "the FCA and ERISA actions address separate injuries to different parties."

After a bench trial, the district court concluded that the defendants had violated the FCA. They were ordered to pay treble damages totaling $7.62 million and a civil penalty of $100,000. This timely appeal followed.

## II.  ANALYSIS

### A.  Standard of review

We will not set aside a district court's findings of fact unless we conclude that the findings are clearly erroneous. *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 938 (6th Cir. 1997). A district court's factual findings are clearly erroneous if, based upon the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1067 (6th Cir. 1994) (citations and internal quotation marks omitted). On the other hand, "[l]ower court findings of ultimate facts based upon the application of legal principles to subsidiary facts are subject to *de novo* review." *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).

### B.  Liability for false claims

The purpose of the False Claims Act is "to provide for restitution to the government of money taken from it by

fraud." *United States v. Hess*, 317 U.S. 537, 551 (1943). Liability under the FCA occurs where a person or entity

(1)  knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . or

(7)  knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . . .

31 U.S.C. § 3729(a).  The FCA provides for treble damages and "a civil penalty of not less than $5,000 and not more than $10,000" for each false claim. *Id.*

For the purposes of this case, the relevant elements of a FCA claim are that: (1) the claim or record submitted was "false or fraudulent," and (2) the person or entity who submitted the claim or record acted "knowingly." Under the statute, a person will be found to have "knowingly" committed an act only if he or she acts with "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). The FCA does not, however, define "false or fraudulent."

Because the Supreme Court has held that the FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968), a number of courts have interpreted the phrase "false or fraudulent" broadly. Our own court, for example, in *United States v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 & n.4 (6th Cir. 1998), concluded that the maxim that "[m]en must

and Goforth both testified that they were familiar with the regulations governing Medicare reimbursement for ESOP costs. *Century Health Servs., Inc.*, 136 F. Supp. 2d at 893. Under these regulations, the defendants should have, at the very least, filed amended cost reports documenting their failure to timely replace the ESOP funds that they withdrew and used for general corporate expenses. The evidence is also clear that the defendants misled an auditor about the status of the ESOP funds. We therefore conclude that the district court did not err in holding the defendants liable pursuant to the FCA.

### C.  Civil penalties

The defendants' argument that the district court erred in imposing a $100,000 civil penalty is premised on exactly the same grounds as their argument that they are not liable under the FCA. For the same reasons stated above in Part II.B., the district court did not err in imposing a civil penalty pursuant to 31 U.S.C. § 3729(a). Given the district court's determination that each of the 20 cost reports submitted by CHS constituted a false claim, and the FCA's provision for a civil penalty of up to $10,000 per claim, the $100,000 civil penalty was well within the permissible statutory range. 31 U.S.C. § 3729(a).

### D.  Election of remedies

The defendants also argue that the district court erred in failing to grant their motion for summary judgment, which was based upon the theory that the government was pursuing inconsistent remedies. As noted above, this case was consolidated for discovery and trial with the Secretary of the Department of Labor's ERISA action. The defendants contend that the district court erred in not invoking the election-of-remedies doctrine.

After concluding that the election-of-remedies doctrine was inapplicable to this case "because the FCA and ERISA actions address separate injuries to different parties," the

auditor that the 1994 ESOP expenses had been liquidated.

*Century Health Servs., Inc.*, 136 F. Supp. 2d at 894. The district court reached this conclusion after noting that, under the Medicare regulations, "[i]f the ESOP contribution is not made for the sole benefit of the ESOP beneficiaries or if the health care provider fails to pay an accrued liability timely, or otherwise comply with Medicare's cost reimbursement rules, the provider is in receipt of Medicare funds to which it is not entitled." *Id*. at 887. In such a case, the healthcare provider has an affirmative obligation to notify the government of this fact and file an addendum to its cost reports. *Id*.

The defendants contend that, even if the cost reports can be considered to be false claims, the district court erred because, at the time the claims were submitted, the defendants did not know that the reports were false. Again, the defendants do not present any evidence or arguments that the district court erred in terms of its specific findings of fact. Their appeal is premised instead on the notion that, in order for liability to attach under the FCA, a defendant must know that a claim is false at the time it is submitted.

At least one district court has indeed expressed concern that holding a defendant liable under a theory of false implied certification vitiates the FCA's scienter requirement. *United States v. Community Home Health of Md., Inc.*, 984 F. Supp. 374, 383-84 (D. Md. 1997). To avoid this problem, we agree with the Tenth Circuit's holding that, "when FCA liability is premised on an implied certification of compliance with a contract, the FCA nonetheless requires that the contractor knew, or recklessly disregarded a risk, that its implied certification of compliance was false." *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 533 (10th Cir. 2000) .

In this case, the government presented compelling evidence that the defendants exhibited a "reckless disregard of the truth or falsity" of their implied certification of compliance. Gilley

turn square corners when they deal with the Government" applies fully in the FCA context. Other circuits have endorsed the "implied certification" theory of liability first laid out in *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 433-34 (Fed. Cl. 1994) (holding Ab-Tech liable pursuant to the FCA after concluding that the company's submission of payment vouchers to the Small Business Administration (SBA) represented an implied certification of its continued compliance with the requirements of the SBA program in question), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995) (unpublished table decision). *See Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001) (concluding that implied false certification is appropriately applied where the underlying statute or regulation expressly states that payment is conditioned on compliance); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir. 2000) (holding that "the language and structure of the FCA itself supports the conclusion that, under 31 U.S.C. § 3729(a)(1), a false implied certification may constitute a false or fraudulent claim") (quotation marks omitted).

*Ab-Tech* involved a construction company's participation in a SBA program that promoted minority-owned businesses. *Ab-Tech Constr., Inc.*, 31 Fed. Cl. at 431-32. In order to receive payments from the SBA, Ab-Tech submitted a number of payment vouchers to the agency. The SBA, however, later learned that Ab-Tech was ineligible to participate in the program. *Id*. at 432-33. As a result, the government filed a FCA lawsuit against Ab-Tech to recover the payments that the company had received. Although the payment vouchers that Ab-Tech submitted to the SBA did not contain any express misrepresentations, the Court of Federal Claims held that the "payment vouchers represented an implied certification by Ab-Tech of its continuing adherence to the requirements for participation in [the SBA] program." *Id*. at 434. The Court of Federal Claims thus held that Ab-Tech's failure to comply with the terms of this implied certification rendered its claims for payment false. *Id*.

In the present case, the district court concluded as follows:

> Defendants are liable under 31 U.S.C. § 3729(a)(1) for knowingly presenting the 1993 and 1994 cost reports to the [government] to secure payment for nonallowable expenses and are liable under 31 U.S.C. § 3729(a)(2) for knowingly using the 1993 and 1994 cost reports to secure payment for nonallowable expenses. Finally, defendants are also liable under § 3729(a)(7) for fraudulently concealing from the auditor that the Century's 1994 ESOP liabilities had not been liquidated and that the ESOP account was empty . . . .

*Century Health Servs., Inc.*, 136 F. Supp. 2d at 894. The defendants, however, claim that the government did not prove that the claims and records they submitted to the government were "false or fraudulent" or, assuming the claims and records were false or fraudulent, that they acted with the requisite level of knowledge.

### 1.   False or fraudulent

In finding that the defendants submitted a false claim, the district court relied in particular upon the "implied certification" theory of liability described above. Specifically, the district court noted that the cost reports submitted by the defendants included a certification that "to the best of my knowledge and belief, [the cost report] is a true, correct, and complete report prepared from the books and records of the provider in accordance with applicable instructions, except as noted." *Id*. at 891. The district court concluded that, "[b]y making this certification, Defendants represented that they would continue to comply with the Medicare regulations governing the allowability of ESOP expenses or notify the [government] that the ESOP expenses had become nonallowable by virtue of their failure to comply with such regulations." *Id*. In coming to this conclusion, the district court relied on uncontroverted evidence that healthcare providers "who request reimbursement for accrued expenses

in their cost reports are required to file an amended cost report if they fail to liquidate their liability in a timely manner or the provider determines that an expense for which they requested reimbursement was nonallowable." *Id*. at 892. Because the defendants in the present case never replaced the money that they withdrew from the ESOP and used for general corporate expenses, and because they did not file amended cost reports documenting their actions, they failed to comply with the Medicare regulations governing reimbursement for ESOP contributions.

But the defendants contend that the district court erred because the cost reports were not false or fraudulent at the time they were submitted. They do not present any evidence or arguments, however, that the district court erred in its determination of specific findings of fact. Instead, their appeal is premised on the notion that, in order for liability to attach under the FCA, a claim must be expressly false at the time it was submitted. We disagree. As noted above, a number of courts have held that a false implied certification may constitute a false or fraudulent claim even if the claim was not expressly false when it was filed. Instead, liability can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned. We adopt this theory of liability, and conclude that the district court did not err in finding it applicable in this case.

### 2.   Scienter

In concluding that the defendants violated the FCA, the district court determined that the defendants

> acted knowingly for purposes of the FCA when they submitted the 1993 and 1994 cost reports to Medicare seeking reimbursement for ESOP expenses as allowable and certifying their present and future compliance with applicable Medicare regulations. Defendants also acted knowingly when they represented to the [government]