RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHARD CHESBROUGH, MD and KIM
CHESBROUGH,

                      *Plaintiffs-Appellants,*

       *v.*

VPA, P.C., doing business as Visiting
Physicians Association,

                    *Defendant-Appellee.*

No. 10-1494

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-15630—Anna Diggs Taylor, District Judge.

Argued: July 27, 2011

Decided and Filed: August 23, 2011

Before: BOGGS, GILMAN, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Danielle C. Schoeny, SOMMERS SCHWARTZ, P.C., Southfield, Michigan, for Appellants. Sheldon H. Klein, BUTZEL LONG, Bloomfield Hills, Michigan, for Appellee. **ON BRIEF:** Danielle C. Schoeny, SOMMERS SCHWARTZ, P.C., Southfield, Michigan, for Appellants. Debra A. Geroux, BUTZEL LONG, Bloomfield Hills, Michigan, Max R. Hoffman, Jr., BUTZEL LONG, Lansing, Michigan, for Appellee.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.  Dr. Richard and Kim Chesbrough appeal the district court's grant of the motion of Visiting Physicians Association, P.C. ("VPA") to dismiss their lawsuit alleging violations of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3279 *et seq.*, and the Michigan Medicaid False Claim Act.  The Chesbroughs allege as *qui tam* relators on behalf of the United States that VPA defrauded the government by submitting Medicare and Medicaid billings for defective radiology studies, and that the billings were also fraudulent because VPA was an invalid corporation.  We affirm the district court's dismissal of the Chesbroughs' action because the Chesbroughs failed to identify any specific fraudulent claim submitted to the government, as is required to plead an FCA violation with the particularity mandated by Federal Rule of Civil Procedure 9(b).

I

Dr. Chesbrough runs Radiology Medical Consultants ("RMC"), a radiology service business.  On January 27, 2006, RMC entered into an agreement with VPA, which provides in-home medical services for homebound and disabled patients, to interpret images created by VPA's technologists.  The contract provided that RMC would serve as an independent contractor and would have "no involvement with billing procedures of Medicare, Medicaid," or any other provider.  VPA would pay RMC for each exam interpreted, per a fee schedule.  According to the Chesbroughs, the images VPA provided them for interpretation were often of poor quality or defective, because the films were overexposed, underexposed, improperly positioned, or omitted necessary clinical information.  After approximately six months, RMC ended its relationship with VPA.

On December 18, 2006, the Chesbroughs filed this action under seal.  They alleged that the diagnostic studies billed by VPA were "false and/or fraudulent," in

violation of 31 U.S.C. § 3729(a)(1)-(2), and the Michigan Medicaid False Claim Act, MCL 400.611(10)(a)(1) ,**[1]** because the tests "were either not properly documented as to indication, were performed with equipment that did not conform to industry standards[,] or were administered by inadequately trained radiology technologists." The Chesbroughs alleged that "approximately one-half of the studies reviewed . . . were of either no diagnostic value or limited diagnostic value." More specifically, they alleged that 50% of the x-ray examinations they reviewed were "so limited or non-diagnostic as to represent defective testing," but that "all were submitted for full reimbursement by VPA." They alleged that 60% of the ultrasound studies they reviewed "did not have appropriate images to render a diagnostic interpretation." They further alleged that 50% of the echocardiograms they reviewed were nondiagnostic or of poor quality. They also alleged that the x-ray examinations and ultrasound studies often had no clinical history or identifying information attached.

The Chesbroughs also alleged that VPA was not owned by a physician, in violation of Michigan's Professional Service Corporation Act, MCL 450.221 *et seq*., and that it was therefore operating as an unauthorized or illegal corporation, in violation of 31 U.S.C. § 3729(a)(2), (7).

The Chesbroughs attached as exhibits to their complaint twenty-seven examples of x-ray examinations that they alleged were defective because of "light technique," poor positioning, or limited views. The x-ray studies included the patient and ordering physician's names, the account number, the facility, the technician's name, and the date of the exam. They also attached a review performed by a vascular technologist of ten ultrasound vascular studies. The reviewer indicated the patients' names and the dates of the studies and opined that the studies did not meet professional standards of practice.

On March 23, 2009, the United States declined to intervene in the action, pursuant to 31 U.S.C. § 3730(b)(4)(B), giving the Chesbroughs the right to continue the

---

**[1]**The district court dismissed the Chesbroughs' action with no mention of their state-law claims. The Chesbroughs do not argue in their briefs to this court that their state-law claims survive, and we therefore do not address those claims.

action themselves.  The district court lifted the seal and ordered the complaint served on April 6, 2009.

On October 23, 2009, VPA filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the complaint failed to meet the particularity requirements of Rule 9(b).  The district court dismissed the complaint on March 30, 2010, after a hearing, reasoning as follows:

> The plaintiffs here appear to be speculating [that] their fraudulent claims were submitted. . . .  The plaintiffs here are unable to provide dates or particularities for even a single claim that was submitted to the government, much less any false statement made in connection therewith.

The Chesbroughs timely appealed.  In their appeal, they raise only the issue of whether their FCA claims meet the requirements of Rule 9(b).

II

The FCA penalizes "[a]ny person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2006).  It also punishes any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," *id.* § 3729(a)(2), or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government," *id.* § 3729(a)(7).[2]  The penalties to

---

[2]In 2009, Congress passed the Fraud Enforcement and Recovery Act, Pub.L. No. 111-21, 123 Stat. 1617 (2009), which renumbered the provisions at issue in this case as § 3729(a)(1)(A), (B), and (G). We refer to the sections as they were numbered at the time the Chesbroughs filed their action.  The language of § 3729(a)(2) was amended, but the change has no impact on the issue in this appeal.  It now reads: "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim." § 3729(a)(1)(B) (emphasis added).  The deletion of the words "to get" likely responded to the Supreme Court's decision in *Allison Engine Co., v. United States ex rel. Sanders*, 553 U.S. 662 (2008), holding that § 3729(a)(2) contained an intent requirement—and thus required that a subcontractor who submitted a false statement to a prime contractor must intend that the statement be used "to get" the government to pay a claim.  By striking the words "to get," Congress eliminated that requirement.  S.Rep. No. 111-10, at 11 (2009).  Here, because there is no issue as to VPA's purpose in submitting claims for allegedly defective studies, we need not decide whether the new language applies to the Chesbroughs' claim. *See United States ex rel. SNAPP, Inc.*, 618 F.3d 505, 514 (6th Cir. 2010) ("SNAPP II") (noting that it is "unsettled" whether the change applies retroactively).

which the FCA subjects a person who submits a false claim to the federal government can include civil penalties and triple damages. *See ibid.* If the government declines to intervene in an action, the relator may proceed independently and be awarded a "reasonable amount"—between 25 and 30 percent—of any proceeds or settlement, along with reasonable costs and attorney's fees. *Id.* § 3730(d)(2).

Complaints alleging FCA violations must comply with Rule 9(b)'s requirement that fraud be pled with particularity because "defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Rule's purpose is to alert defendants "as to the particulars of their alleged misconduct" so that they may respond. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007). The heightened pleading standard is also designed to prevent "fishing expeditions," *id*. at 503 n.11, to protect defendants' reputations from allegations of fraud, *ibid.*, and to narrow potentially wide-ranging discovery to relevant matters, *United States v. SNAPP, Inc.*, 532 F.3d 496, 504 (6th Cir. 2008) ("SNAPP I").

We review de novo a district court's dismissal of a complaint for failure to plead with particularity under Rule 9(b). *Bledsoe*, 501 F.3d at 502. The Rule "is to be interpreted in conjunction with Federal Rule of Civil Procedure 8," requiring a "short and plain statement of the claim." *Id.* at 503. Construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true, we determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To plead fraud with particularity, the plaintiff must allege (1) "the time, place, and content of the alleged misrepresentation," (2) "the fraudulent scheme," (3) the defendant's fraudulent intent, and (4) the resulting injury. *Bledsoe*, 501 F.3d at 504.

For the purposes of this case, the relevant elements of the claim are the "fraudulent scheme" and the "misrepresentation"—the actual presentment of a false claim to the government.

### *The Fraudulent Scheme*

We first examine whether the Chesbroughs have alleged a scheme that constitutes "fraud" within the meaning of the FCA. They allege that VPA engaged in a pattern of "continuous fraudulent Medicare and Medicaid billing." The FCA reaches claims submitted by health-care providers to Medicare and Medicaid—indeed, one of its primary uses has been to combat fraud in the health-care field. *Mikes v. Straus*, 274 F.3d 687, 692 (2d Cir. 2001).

As examples of VPA's alleged fraud, the Chesbroughs attached to their complaint twenty-seven x-ray studies and a review of ten vascular ultrasound studies, all of which were allegedly defective or nondiagnostic. Most of the studies are described as "suboptimal" or of "poor quality," or as failing to meet "standards of care." The equipment used and the technicians' technique are criticized. The Chesbroughs allege that the studies do not meet industry standards established by the American College of Radiology and the Society for Vascular Ultrasound. Of the thirty-seven appended studies, five are described as nondiagnostic, while the rest were apparently used for diagnosis. *See* R.20-2 (Ex.D) at 3, 4, 9, 14, 16. The Chesbroughs argue that "Medicare and Medicaid should not reimburse for such poor quality testing[,] and billing for such is prohibited by regulation." R.20 at ¶ 4.

Not all of the appended studies, however, can support a claim of "fraud" for the purposes of an FCA action. Although the FCA does not define the terms "false" and "fraudulent," as used in the statute, courts have interpreted the language to require a defendant to have aimed to extract from the government "money the government otherwise would not have paid." *Mikes*, 274 F.3d at 696.

There are situations in which a claimant's failure to comply with regulations can make claims submitted to the government "fraudulent" within the meaning of the FCA.

This theory of liability is referred to as "false certification." *United States ex rel. Willis v. United Health Grp.*, ___F.3d___, 2011 WL 2573380, at *6 (3d Cir. June 30, 2011). When a claim expressly states that it complies with a particular statute, regulation, or contractual term that is a prerequisite for payment, failure to actually comply would render the claim fraudulent. *See Mikes*, 274 F.3d at 697–99.

The Chesbroughs, however, do not argue that VPA expressly certified that its studies complied with industry standards. Rather, they contend that, in submitting claims, VPA *impliedly* certified that the studies for which it billed met those standards. In *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002), this court adopted the "implied certification" theory of liability, holding that "liability can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned." *Ibid.* Under that theory, it is not the violation of a regulation itself that creates a cause of action under the FCA. Rather, noncompliance constitutes actionable fraud only when compliance is a prerequisite to obtaining payment. Thus, a relator cannot merely allege that a defendant violated a standard—he or she must allege that compliance with the standard was required to obtain payment.

As an example of the application of the implied-certification theory, the Second Circuit in *Mikes* addressed whether the *qui tam* relator, a pulmonologist, had sufficiently alleged fraud when she contended that the defendant health-care providers had submitted reimbursement requests to the government for spirometry (lung function) tests that were inaccurate and did not conform to guidelines established by the American Thoracic Society. 274 F.3d at 694–95. The court held that, even though the defendants submitted forms certifying that the services provided were "medically indicated and necessary," they never certified that the spirometry procedure was executed to a particular standard. *Id.* at 698. The court distinguished between procedures that should not have been performed or billed, because they were unnecessary for diagnosis or were not covered by Medicare or Medicaid, and procedures that were of poor quality. *Id.* at 699. Compliance with certain standards of medical care was not required for reimbursement,

and the court declined to interpret the FCA in a way that would "enforce compliance with all medical regulations," because "courts are not the best forum to resolve medical issues concerning levels of care." *Id*. at 699–700. Quality-of-care issues were better monitored by state and local agencies and medical boards and societies than *qui tam* relators and the federal government. *Ibid.*

Although the Chesbroughs allege that VPA failed to meet "objective standards" for testing, they do not allege that VPA was expressly required to comply with those standards as a prerequisite to payment of claims. They identify no specific Medicare or Medicaid regulation that mentions the standards. They instead allege generally that "Medicare regulations . . . only allow for reimbursement of indicated, appropriate diagnostic testing on Medicare beneficiaries." Medicare does not require compliance with an industry standard as a prerequisite to payment. Thus, requesting payment for tests that allegedly did not comply with a particular standard of care does not amount to a "fraudulent scheme" actionable under the FCA.

The Chesbroughs do attach to their complaint five studies that are allegedly "nondiagnostic." These, we believe, could form the basis of an FCA claim. A test known to be of "no medical value," that is billed to the government would constitute a claim for "worthless services," because the test is "so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes*, 274 F.3d at 702–03. If VPA sought reimbursement for services that it knew were not just of poor quality but had *no* medical value, then it would have effectively submitted claims for services that were not actually provided. This would amount to a "false or fraudulent" claim within the meaning of the FCA. *See ibid.* ("[A] worthless services claim is a distinct claim under the Act. It is effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided."); *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001) ("In an appropriate case, knowingly billing for worthless services . . . may be actionable under § 3729, regardless of any false certification conduct."). Thus, we find that the Chesbroughs have

adequately alleged a fraudulent scheme only insofar as they claim that VPA knowingly submitted claims to the government for completely nondiagnostic tests.

The Chesbroughs also posit other fraudulent schemes. They allege that VPA violated the Health Insurance Portability and Accountability Act (HIPAA) by failing to preserve patient confidentiality. But they do not cite to a statute or regulation that conditions payment of a claim on compliance with HIPAA.

The Chesbroughs further allege that VPA is an "illegal corporation" under Michigan law because it is not owned by a person licensed to perform medical services. They cite 42 C.F.R. §§ 410.32(b)(3) and 410.33(a) for the requirements with which VPA failed to comply. Examining those regulations, however, we do not find that the facts alleged in the complaint would violate those regulations. Under § 410.32(b)(3),

> [e]xcept where otherwise indicated, all diagnostic x-ray and other diagnostic tests subject to this provision and payable under the physician fee schedule must be furnished under at least a general level of physician supervision as defined in paragraph (b)(3)(i) of this section. In addition, some of these tests also require either direct or personal supervision as defined in paragraphs (b)(3)(ii) or (b)(3)(iii) of this section, respectively. (However, diagnostic tests performed by a physician assistant (PA) that the PA is legally authorized to perform under State law require only a general level of physician supervision.) When direct or personal supervision is required, physician supervision at the specified level is required throughout the performance of the test.

42 C.F.R. § 410.32(b)(3). We do not find in the Chesbrough's complaint any allegation that VPA allowed tests to be performed without physician supervision, and this regulation therefore cannot support a fraudulent scheme. Notably, while the Chesbroughs allege that VPA is not owned by a licensed medical practitioner, in violation of Michigan law, the federal regulation does not state that tests must be performed by an entity *owned* by a physician. Similarly, the Chesbroughs have not alleged that VPA violated 42 § C.F.R. 410.33(a), which provides in relevant part that

> carriers will pay for diagnostic procedures under the physician fee schedule only when performed by a physician, a group practice of physicians, an approved supplier of portable x-ray services, a nurse

> practitioner, or a clinical nurse specialist when he or she performs a test he or she is authorized by the State to perform, or an independent diagnostic testing facility (IDTF).

Nothing in the complaint alleges that VPA submitted claims "under the physician fee schedule" that were not performed by a physician or specialist authorized to perform the test. Rather, the complaint alleges generally that VPA was an "illegal corporation." Even if VPA is not incorporated in compliance with Michigan law and is not owned by a physician, the Chesbroughs identify no regulation that makes payment contingent on compliance with Michigan's laws of incorporation. We conclude that the Chesbroughs have failed to plead a fraudulent scheme based on these theories.

### *Presentment to the Government*

Having concluded that the Chesbroughs have sufficiently alleged a fraudulent scheme insofar as they have claimed VPA billed the government for worthless tests, we must decide whether they have sufficiently alleged that claims for *those* tests were actually submitted to the government. In *Bledsoe*, this court held that, where a relator alleges a "complex and far-reaching fraudulent scheme," in violation of § 3729(a)(1), it is insufficient to simply plead the scheme; he must also identify a representative false claim that was actually submitted to the government. 501 F.3d at 510. Although the relator does not need to identify *every* false claim submitted for payment, he must identify with specificity "characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme." *Id.* at 511 (internal quotation marks omitted); *see also SNAPP I*, 532 F.3d at 506 (holding that relator failed to "include specific examples of the defendant's claims for payment" when it alleged defendant entered into an "undetermined number of contracts with the federal government"); *SNAPP II*, 618 F.3d at 514 (concluding that annual contracts with government did not constitute "claims"). The Chesbroughs argue that the studies they attached to their complaint satisfy the requirement that they identify representative claims. The challenge they face, however, is that they cannot identify any actual claims made by VPA for payment. In *Bledsoe*, a relator alleged that a health care provider engaged in schemes to defraud Medicare and Medicaid involving the fraudulent use of physician provider numbers, the

submission of inflated cost reports, and the miscoding of procedures.  This court held that, with respect to all but a handful of his claims, the relator failed to identify with particularity any billings or cost reports that were actually submitted to the government, or any dates on which bills were submitted.  See *id.* at 511–15.  Therefore, the relator failed to satisfy Rule 9(b).  *Ibid.*[3]

Similarly, in *Sanderson v. HCA - The Healthcare Co.*, 447 F.3d 873 (6th Cir. 2006), this court held that a complaint alleging a scheme of misallocating hospital debt to maximize federal reimbursements failed to satisfy Rule 9(b) because, although it detailed the allegedly fraudulent accounting methodology, it did not identify specific fraudulent cost reports.  *Id.* at 878–79.  And in *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439 (6th Cir. 2008), we dismissed a complaint because a relator alleged that false reports were compiled on workplace injuries, but failed to connect the alleged fraud to claims submitted to the government.  *Id.* at 446 ("Marlar does not allege personal knowledge of the procedures through which BWXT compiled its [reports] submitted to DOE.").  If the government had intervened in the Chesbrough's action, it could presumably have identified actual claims submitted by VPA; the Chesbroughs—like the relators in the above cases—have no first-hand knowledge of VPA's billing practices.

*Bledsoe* left open the possibility that a court may "relax" the requirements of Rule 9(b) "in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator."  501 F.3d at 504 n.12.  We declined to speculate "as to the contours or existence of any such exception to the general rule that an allegation of an actual false claim is a necessary element of a FCA violation."  *Ibid*.

*Bledsoe* cited an Eleventh Circuit case, *Hill v. Morehouse Medical Associates, Inc.*, 2003 WL 22019936 (11th Cir. August 15, 2003) (unpublished), as an example of

---

[3]We allowed one portion of the *Bledsoe* complaint to go forward.  The relator alleged fraudulent billing with respect to a particular patient, submitted to Medicaid on a particular date.  *Id*. at 514.

when this relaxed standard might be appropriate.  In *Hill*, the relator was a former billing department employee who alleged that she had seen claims with fraudulently altered billing codes submitted to Medicare.  *Id.* at *1.  Although she could not identify the specific names and dates of the claims, she had personal knowledge that billings were submitted because she had worked in the billing department.  The Eleventh Circuit held that her allegation sufficed to "alert[] the defendants to the precise misconduct with which they are charged."  *Id.* at *5 (alteration added, quotation marks and alteration omitted).

Other examples of the application of the relaxed standard come from the Eleventh Circuit and district courts in this circuit.  In *United States v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349 (11th Cir. 2005), the Eleventh Circuit found the pleading standard satisfied when a nurse "believed" fraudulent claims for services were submitted based on her personal discussions with an office administrator.  *Id.* at 1360.  In *United States ex rel. Lane v. Murfreesboro Dermatology Clinic*, *PLC*, 2010 WL 1926131 (E.D. Tenn. May 12, 2010), a claim went forward in which the plaintiff was a former billing specialist with specialized knowledge of defendant's billing practices, but could not identify specific claims because she no longer worked for defendant.  *Id.* at *4.

The Chesbroughs argue that the relaxed standard should apply to their action, because, as independent contractors, they had no access to VPA's billing records, but, they claim, the facts support "a reasonable inference—not a mere assumption—that VPA did, in fact, submit claims to Medicare for the radiological services and studies VPA and Dr. Chesbrough completed." Appellant Br. 19.  They contend that they provided detail as to 1) the time frame in which the alleged fraud occurred—a six-month period in 2005 and 2006, 2) the place and content of the fraud, 3) the fraudulent "scheme," and 4) the fact that the United States was injured as a result of improper billing.  They point out that they attached to their complaint studies that contained patient, physician, and technician names and dates.  The attachments, they argue, "provided sufficient detail of time, place, and content to comply with the pleading requirements and enable VPA to respond to Relator's claims."  Further, because their contract with VPA stated that VPA would be

"responsible for all billing," it is a reasonable inference that VPA submitted claims to Medicare for the studies it performed.

Although we do not foreclose the possibility that this court may apply a "relaxed" version of Rule 9(b) in certain situations, we do not find it appropriate to do so here. The case law just discussed suggests that the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted. Such an inference may arise when the relator has "personal knowledge that the claims were submitted by Defendants . . . for payment." *Lane*, 2010 WL 1926131, at *5; *see also Marlar*, 525 F.3d at 446 ("Marlar does not allege personal knowledge of [billing] procedures . . . ."); *Hill*, 2003 WL 22019936, at *3. Here, the Chesbroughs lack the personal knowledge of billing practices or contracts with the government that the relators had in cases like *Lane*. Their personal knowledge is limited to the allegedly fraudulent scheme.

There may be other situations in which a relator alleges facts from which it is highly likely that a claim was submitted to the government for payment. But that, too, is not the case here. The mere existence of a few allegedly "nondiagnostic" tests does not support a strong inference that claims for those tests were submitted to the government. Assuming that the five tests alleged by the Chesbroughs to be nondiagnostic constituted "worthless services," it is not necessarily true that VPA billed the government for these tests. To conclude that a claim was presented requires a series of assumptions. First, one must assume that the tests were performed on Medicare or Medicaid patients, and could therefore have been billed to the government. The Chesbroughs allege in the complaint that "[a]pproximately 50% of [VPA]'s patients are Medicare or Medicaid beneficiaries." One must then assume that VPA submitted bills for useless tests. The Chesbroughs argue that VPA, as a for-profit company, must have billed for the services it performed. But VPA might have absorbed the expense of the five nondiagnostic tests itself. Thus, this is not a situation in which the alleged facts

support a strong inference—rather than simply a possibility—that a false claim was presented to the government.

The Chesbroughs argue that they have alleged sufficient facts to allow VPA to respond to their complaint, and that information about claims submitted to the government is exclusively within VPA's control. The complaint alerted VPA to "exactly what the fraud entails," *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir. 2009), and VPA is in the position to verify whether claims for the particular studies attached to the complaint were submitted. This court, however, has rejected the argument that a claim should survive a motion to dismiss on the basis that necessary information is exclusively within the defendant's control, even in the context of the less rigorous pleading requirements of Federal Rule of Civil Procedure 8. *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, __F.3d__, 2011 WL 2448909, at *3 (6th Cir. June 21, 2011) ("[P]laintiff must allege specific facts . . . even if those facts are only within the head or hands of the defendants. The plaintiff may not use the discovery process to obtain these facts after filing suit.").

In *Bledsoe*, *Sanderson*, and *Marlar*, we imposed a strict requirement that relators identify actual false claims. The Chesbroughs have no personal knowledge that claims for nondiagnostic tests were presented to the government, nor do they allege facts that strongly support an inference that such billings were submitted. We therefore conclude that the Chesbroughs' complaint fails to satisfy Rule 9(b).

*Alleged Violations of § 3729(a)(2), (7)*

The Chesbroughs attempt to skirt *Bledsoe*'s requirement by alleging violations of § 3729(a)(2), (7). They argue that, even if actual false claims must be identified in an action under § 3729(a)(1), "there is no requirement of presenting a claim to the Government" for actions pursuant to § 3729(a)(2), (7). For support, they cite *Allison Engine*, in which the Supreme Court explained, "What § 3729(a)(2) demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the

purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" 553 U.S. at 671.

But the Chesbroughs' argument misses the Supreme Court's point in *Allison Engine*. The case addressed the possibility that, rather than presenting a claim to the government itself, a defendant might instead be a subcontractor who "submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim." *Id.* at 671. Thus, the fact that "presentment" is not required for a § 3729(a)(2) claim does not relieve the Chesbroughs of the need to plead a connection between the alleged fraud and an actual claim made to the government.

Moreover, although the Chesbroughs are correct that § 3729(a)(7), known as "the reverse false claims" provision, does not require presentment of a claim to the government, it does require "proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation"—a duty to pay money or property. *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 736 (6th Cir. 1999). The Chesbroughs have not identified in their complaint any concrete obligation owed to the government by VPA at the time an allegedly false statement was made. Rather, they merely allege that VPA is obligated to repay all payments it received from the government. Their allegations involving § 3729(a)(7) accordingly fail.

III

The district court's dismissal of the Chesbroughs' FCA action is therefore AFFIRMED.