McKEAGUE, Circuit Judge,
concurring in part and dissenting in part.
Marjorie Prather sued defendants for allegedly violating the False Claims Act. One violates the Act by presenting false claims for payment to the federal government. Yet Prather’s complaint does not allege that defendants presented any claims. to Medicare that were actually false. In fact, the majority concedes that Prather’s theory of the case—that defendants treated patients without supervision and only later found doctors willing to lie on the paperwork about their involvement—is not alleged with sufficient particularity in her complaint, For the majority, this defect requires the dismissal only, of Prather’s false-records claims. It. should, however, be fatal to Prather’s entire case.
Instead, the majority improvises a way to salvage Prather’s other claims related to defendants’ requests for final payment and requests for anticipated payment. First; the majority fashions its own Medicare rule: home health agencies must have doctors sign certifications and face-to-face documentation before starting care or provide a valid excuse for not doing so. Even after the majority creates this valid-excuse requirement and decides defendants violated it, Prathér’s request-for-anticipated-payment claims are still not safe—Prather never pleaded with particularity, as Rule 9(b) demands, that defendants presented these requests to Medicare. So the majority also decides that we should apply an exception to Rule 9(b) for Prather—a first in this circuit. Because the majority’s conclusion that Prather pleaded falsity is inconsistent with Medicare regulations and CMS guidance; and because this is not an *776 appropriate case to relax Rule 9(b), I respectfully dissent.
I
Defendants sent Medicare two different types of requests: (1) requests for final payments and (2) requests for anticipated payments. See Maj. Op. at 756-57. Prather argues that the falsity in both types stems from defendants’ failure to comply with certain Medicare regulations. When defendants submitted these claims for payment, they warranted that they abided by Medicare’s rules. Thus, if defendants actually violated the applicable regulations, then any submitted claims were false.
The supposed violations for both types of requests are essentially the same, but it is worth distinguishing them because additional regulatory guidance makes Prather’s arguments even weaker with respect to anticipated-payment requests. So although the following analysis discusses only requests for final payments, it applies with equal force to requests for anticipated payments. Similarly, Prather’s two theories of how defendants broke the Medicare rules—that doctors (1) did not sign ■certifications regarding patients’ need for home health services when patients’ plans of care were established or “as soon thereafter as possible”; and (2) also did not sign documentation regarding face-to-face encounters with patients in a timely enough manner—require an identical analysis. See Maj. Op. at 766, n.8. Thus, even though I discuss only the certifications of need for home health services, this discussion also applies to the face-to-face documentation.
For Medicare to pay for home health services, a physician must certify that patients meet certain eligibility requirements. 42 C.F.R. § 424.22. Specifically, the physician must certify that (1) home health services “are or were required”; (2) a plan of care has been established and is periodically reviewed by a physician; (3) the services “are or were furnished while the individual is or was under the care of a physician”; and (4) “prior to making such certification the physician must document that the physician ... has had a face-to-face encounter .,. with the individual during the 6-month period preceding such certification.” 42 U.S.C. § 1395n(a)(2)(A); see also 42 U.S.C. § 1395f(a)(2)(C). Medicare will only pay a claim submitted with a completed certification. 42 C.F.R. § 42410(a).
The regulations do not prescribe an exact timeframe for the physicians to complete a certification. Instead, they provide that “[t]he certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible.” 42 C.F.R. § 424.22(a)(2) (emphasis added). Although the government indicates in its statement of interest that a certification “is not a backward-looking analysis of the medical necessity of services performed,” but “is a forward-looking projection of medical need,” it also recognizes that the regulations “provide some leeway to providers in obtaining the certifying physician’s signature.” R. 66, Gov’t Statement of Interest at 3 & n.l, Page ID 860. This case, as the majority recognizes, turns on the phrase “as soon thereafter as possible.”
Medicare regulations leave “as soon thereafter as possible” undefined. But the regulations do provide some information about the deadline for certifications. We know that a certification must be completed within one year, because home health agencies must submit claims for final payment within one year. See 42 C.F.R. § 424.44(a). We also know that face-to-face encounters must occur before certification, 42 U.S.C. § 1395n(a)(2)(A), and that these encounters may occur “within 30 days of the start of the home health care.” 42 *777 C.F.R. § 424.22(a)(l)(v). The rules also make it clear that a certification may be completed after services are provided, because the physician must certify that home health services “are or were required” and that services “are or were furnished while the individual is or was under the care of a physician.” 42 U.S.C. § 1395n(a)(2)(A) (emphasis added). So, in sum, we know that a certification must be completed within one year and may occur (1) when the plan of care is established; (2) at some point after the face-to-face encounter, which can occur up to 30 days after care begins; or (3) at some point after care ends.
Given the flexibility apparent in this scheme, defendants argue that a certification has only one real deadline: it has to be completed at a point prior to submitting a final claim for payment—that is, within one year. Defendants point to guidance from CMS and other Medicare-related organizations to support their position. The Medicare General Information, Entitlement, and Eligibility Manual states that “the attending physician [must] sign[ ] and date[j the POC/eertification prior to the claim being submitted for payment.” Medicare Manual, CMS Pub. 100-01, Ch. 4, § 30.1 (April 2011) (emphasis added). In 2013, in collaboration with CMS and the Medicare Learning Network, the American Medical Association published advisory guidance stating the same requirement. See Medicare Learning Network, MLN Matters Article SE1436 at 4, available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE 1436.pdf (“According to the regulations ... physicians should complete the certification when the plan of care is established or as soon as possible thereafter. The certification must be complete prior to when an HHA bills Medicare for reimbursement.”) (emphasis added). Contractors who are under CMS supervision and must comply with Medicare billing rules have issued similar guidance. See, e.g., Ask-the-Contractor Questions and Answers, June 21, 2015 at No. 5, available at https://www. cgsmedicare.com/hhh/education/faqs/act/ act_qa062415.html (citing the Medicare Manual and the MLN article) (“The physician certification must be signed before the final claim is submitted.”).
Prather offers little to challenge defendants’ interpretation. She relies on a 2015 Medicare Benefit Policy Manual which suggests that “[i]t is not acceptable for [home health agencies] to wait until the end of a 60-day episode of care to obtain a completed certification/recertification.” R. 86-2, 2015 Medicare Benefit Policy Manual § 30.5.1, Page ID 1270. But her reliance on this manual is unpersuasive for two reasons. First, it was issued in 2015, and thus could not establish that defendants were required in 2010 and 2011 to obtain certifications before care had ended.[1] Second, the 2015 Manual’s language is inconsistent with the statute, which clearly contemplates that physicians may complete certifications after care has been provided. See 42 U.S.C. § 1395n(a)(2)(A) (providing that physicians must certify that services “are or were required” and that services “are or were furnished”) (emphasis added).
*778 Given this regulatory scheme and the CMS guidance supporting defendants’ position, I am persuaded that, at the time defendants’ conduct occurred, Medicare regulations allowed defendants to obtain doctors’ certifications so long as they were completed before final claims were submitted. If CMS intended something different, it would have defined “as soon thereafter as possible” in the regulations or clarified the deadline in its guidance. It did not, and Prather has not provided a single instance where Medicare determined that certifications were obtained “too late” because they were not completed “as soon thereafter as possible.” I would therefore hold that defendants did not violate any Medicare regulations by submitting final claims with doctors’ signatures obtained after care had ended but before defendants submitted the claims for payment. Because this reasoning applies equally to face-to-face documentation, I would hold that Prather has not stated a valid claim based on the theory that defendants violated the regulations.
II
The majority takes a different view. It asserts that “[t]he regulation’s use of the phrase ‘as soon thereafter as possible’ suggests plainly that the analysis of whether a certification complies requires that the reason for any delay be examined.” Maj. Op. at 763. Under this approach, home health agencies must explain themselves any time a physician completes a certification after the plan of care is established. This conclusion is unsupported. And how the majority arrives at it is troubling.[2]
As an initial matter, the regulations do not require that anyone examine “the reason for any delay” in securing signatures— let alone that the federal judiciary. For the majority to create this supervisory role for itself, it must cobble together weak, inap-posite authority.
Because the relevant regulations do not support a valid-excuse rule, the majority must turn to a separate regulation related to “other forms of health services.” Maj. Op. at 765-64, n.4 (quoting 42 C.F.R. § 424.11(d)(3)). That regulation imposes a true “timeliness” requirement and “[delayed certification and recertification statements are acceptable when there is a legitimate reason for delay” provided the statements “include an explanation of the reasons for the delay.” Id. The majority cites § 424.11(d)(3) as evidence of a “general principle” that Medicare requires reasons for delays. What § 424.11(d)(3) actually shows is that CMS knows how to impose an explanation requirement when CMS thinks it is warranted. If Congress or CMS had intended for this rule to apply to home health services, they would have said so. But neither the statute nor the regulations provide even a hint that home health agencies must explain delays in seeming certifications.
Without a rule on point, the majority makes a curious and disturbing move: it somehow construes the absence of a requirement for defendants to explain any delay as a license for the court to create one. See Maj. Op. at 764 (noting that “nothing in the regulatory or statutory context counsels” against requiring an explanation for delay). To impose a new requirement on home health agencies, the majority thinks that the court only needs to find that ■ current regulations do not prohibit it. It is Congress’s job to pass statutes, the agencies’ job to write regulations, and our job to interpret them. It is not our job to create new rules—especially when our creations would, as in this case, be applied retroactively to result in massive liability.
*779 The majority tries to normalize this overreach. The only authority it can cite, however, is non-binding Second Circuit case law on unrelated education regulations. See D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503 (2d Cir. 2006), op. amended in part by 480 F.3d 138 (2d Cir. 2007). In D.D., the Second Circuit concluded that the phrase “as soon as possible” required an inquiry into the reasons for delays in implementing education programs for disabled students. Id. at 514-15. Importantly, the Second Circuit relied on guidance from the Secretary of Education to reach this result. See id. The Secretary suggested that “as soon as possible” meant “without undue delay,” “with very limited exceptions,” and then provided examples of when delay would be justified. Id. at 513-14. “Based on this commentary,” the Second Circuit determined that the time frame “necessitate^] a specific inquiry into the causes for delay.” Id. at 514. In this case, neither Medicare nor CMS indicated that, before 2011, home health agencies had to explain any delay in obtaining doctors’ certifications. If anything, D.D. establishes merely that we should pay careful attention to commentary from the relevant agency. And the only commentary we have from CMS indicates that defendants were allowed to submit certifications when they did.
The majority also appeals to what it views as common sense: “No responsible litigant or attorney asked by a court during oral argument to submit a supplemental brief ‘by the end of the week or as soon thereafter as possible’ would wait three months to do so.” Maj. Op. at 764. That might be true, but the analogy is flawed. A litigant would not wait three months to file a supplemental brief because courts have made it clear that they would not consider such a brief. Medicare, on the other hand, has never indicated that it would consider claims with certifications or face-to-face documentation signed after care has ended only if home health agencies provide a valid explanation for any delay. If Medicare had indicated that defendants’ practice was unacceptable prior to 2011, then the majority would have a point. Instead, the majority chides defendants for failing to meet a requirement in 2010 and 2011 that the court only invented today.
Lastly, the majority cites what it considers pragmatic reasons for imposing its rule. These include a belief that its rule will deter Medicare fraud. But the majority never addresses its rule’s burdens and uncertainties—Medicare and courts would have to proceed on a case-by-case basis to examine the validity of proffered reasons for delay without a guide as to what an “acceptable” reason might be. Unsurprisingly, the majority also avoids considering the pragmatic reasons why we leave promulgating regulations to agencies and not the courts.
Bad facts make bad law. So, apparently, do bad complaints. One might suspect the majority never addresses these issues because it has actually adopted Prather’s theory:, that “certifications were obtained months late due only to the fact that Brookdale had accumulated a large backlog of Medicare claims, which itself arose solely because of Brookdale’s ‘aggressive solicitation’ of its residents for Medicare-billable treatments that were not always medically necessary or did not need to be performed by nurses who billed to Medicare.” Maj. Op. at 765, Thus, although Prather disclaimed any argument that defendants provided unnecessary care, and although the majority concedes that Prather did not adequately plead that defendants falsified any documents, the majority endeavors today to manufacture falsity in defendants’ claims because it believes Prather’s unpled and disclaimed theory of *780 the case. I find this rationale wholly unpersuasive.
Ill
The majority’s reasoning for holding that Prather states a claim based on the requests for anticipated payment is also unpersuasive. 'My entire analysis for final-payment requests applies to anticipated-payment requests. Moreover, we have additional guidance from CMS to indicate that home health agencies do not even need to submit signed certifications, and face-to-face documents with their requests for anticipated payment, or “RAPs” as the guidance refers to them.
• The Medicare Claims Processing Manual (MCPM) provided by CMS states that home health agencies can submit an RAP to Medicare when the four following conditions are met: (1) an outcome assessment is complete, or there is an agency-wide internal policy establishing that the outcome data is finalized for transmission to the State; (2) a physician’s verbal orders for home care have been received and documented; (3) a plan of care has been established and sent to a physician; and (4) the first service visit under that plan has been delivered. MCPM, Ch. 10, § 10.1.10.3 (May 2011). The manual does not mention anything about certifications or face-to-face documentation with regard to RAPs. Medicare contractors have also indicated that RAPs do not require signed certifications or face-to-face documentation. Ask-the-Contractor Questions and Answers, June 21,2015 at No. 5, available at https:// www.cgsmedicare.com/hhh/education/faqs/ act/act_qa062415.html (citing the Medicare Manual and the MLN article) (“The physician certification must be signed before the final claim is submitted. The RAP can be billed before the certification is signed.”) (emphasis added). Given the near-uniformity of CMS guidance regarding RAPs and the lack of any indication that RAPs require signed certifications or face-to-face documentation, I would hold that Prather has failed to state a claim that defendants violated the Act when submitting RAPs.[3]
IV
Finally, I must also disagree with the majority’s decision to apply a never-before-used exception to Rule 9(b) for Prather’s RAP-related claims. To state a claim under the False Claims Act, 31 U.S.C. § 3729, a plaintiff must .sufficiently plead:
[1] that the defendant [made] a false statement or create[d] a false record [2] with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information; [3] that the defendant ... submitted a claim for payment to the federal government; ... and [4] that the false statement or record [was] material to the Government’s decision to make the payment sought in the defendant’s claim.
U.S. ex rel. SNAPP, Inc. v. Ford Motor Co., 618 F.3d 505, 509 (6th Cir. 2010). Like other claims asserting fraud, complaints alleging violations under the Act “ ‘must comply with Rule 9(b)’s requirement that fraud be- pled with particularity.’ ” U.S. ex rel. Sheldon v. Kettering Health Network, 816 F.3d 399, 407 (6th Cir. 2016) (quoting Chesbrough v. VPA, P.C., 655 F.3d 461, 466 (6th Cir. 2011)). Having already ex *781 plained that Prather- never plead falsity, I would also hold that Prather has failed to allege with particularity that defendants submitted claims for payment.
Our cases have consistently affirmed that “we impose a ‘strict requirement that relators identify actual false claims.’ ” U.S. ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC, 642 Fed.Appx. 547, 551 (6th Cir.2016). As the majority concedes, Prather has not done so. Maj. Op. at 769. However, “we have ‘left open’ the possibility that Rule 9(b)’s requirement might be relaxed in some circumstances.” Id. We have indicated that Rule 9(b) “may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted.” Chesbrough, 655 F.3d at 471. For example, we have suggested we plight relax Rule 9(b)’s standard in a case where “the relator worked in the billing department of the hospital, she described the alleged fraud in great detail, and she allegedly possessed first-hand knowledge that false claims had been submitted to the government.” U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493, 504 n.12 (6th Cir. 2007).
The purpose underlying this potential exception is to allow a relator to bring a claim when it would be impossible to allege fraud with particularity—to relax the standard “in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator.” Id. We have never applied this exception, but the majority would use this case to do so.
As I do not believe defendants violated Medicare regulations, I would not even address this issue. But even if Prather is deemed to have adequately alleged a “falsity,” it is merely technical noncompliance and not a truly “fraudulent scheme.” I would not lower Rule 9(b)’s pleading standard for the presentment- requirement simply because defendants secured doctors’ signatures “too late.” Her complaint lacks factual allegations to support the fraudulent’ scheme Prather actually believes existed: that defendants provided care without any doctor involvement. The majority has gone to great lengths to craft a way around this deficiency by reframing Prather’s allegations as claims that defendants submitted RAPs with late signatures. I would not go even further by then lowering Rule 9(b)’s pleading standard for the first time.
V
At the end of the day, this case is.about late signatures, not false claims. The majority’s new requirement for Medicare payment might be a good idea, but that is something for Congress or CMS, not two appellate judges, to decide. And even if some cases may warrant relaxing Rule 9(b)’s pleading standard—an exception I am not convinced we should adopt—the proper case should involve a truly fraudulent scheme. Because Marjorie Prather’s complaint fails to state a valid claim that defendants submitted false claims, I respectfully dissent.

. As the majority noted, the 2014 Manual did not have this language. Maj. Op. at 765 n.6 (citing R. 58-1, 2014 Medicare Benefit Policy Manual § 30.5.1, Page ID 377-78). And as the district court pointed out, even if the 2015 manual did create a new rule, it does not apply to conduct that occurred before that date and is therefore inapplicable to defendants' conduct in 2011. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (noting that "[rjetroactivity is not favored in the law” and holding, that retroactive application of Medicare regulation was inappropriate because law did not. include express authorization for retroactive rulemaking).

. Again, this same analysis applies to face-to-face documentation.

. The majority concedes that, under 42 C.F.R. § 409.43(c)(3), an RAP need not include a "physician signed plan of care.” Maj. Op. at 766. The regulations themselves have no requirement that RAPs include any signed docu- . mentation. I find it unlikely that the regulations would specifically- allow RAPs without signed plans of care while imposing an unstated requirement that they include signed certifications—particularly in light of Medicare guidance documents indicating that certifications are not required.